**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2734-15T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

S.K.,[1]

    Defendant,

and

C.K.,

    Defendant-Appellant.

————————————————————————————

IN THE MATTER OF JE.K. and JA.K.,

    Minors.

————————————————————————————

> **APPROVED FOR PUBLICATION**
>
> **August 31, 2018**
>
> **APPELLATE DIVISION**

Argued October 11, 2017 — Decided  August 31, 2018

Before Judges Fuentes, Koblitz and Manahan.
(Judge Koblitz concurring).

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Camden County,
Docket No. FN-04-0619-15.

Thomas G. Hand, Designated Counsel, argued the
cause for appellant (Joseph E. Krakora, Public

---

[1]  Pursuant to Rule 1:38-3(d)(12), we use initials and pseudonyms to identify the parties to protect their privacy and preserve the confidentiality of these proceedings.

Defender, attorney; Thomas G. Hand, on the
briefs).

William T. Harvey, Jr., Deputy Attorney
General, argued the cause for respondent
(Christopher S. Porrino, Attorney General,
attorney; Melissa Dutton Schaffer, Assistant
Attorney General, of counsel; Alexa L. Makris,
Deputy Attorney General, and William T.
Harvey, Jr., on the briefs).

Olivia Belfatto Crisp, Assistant Deputy Public
Defender, argued the cause for minors (Joseph
E. Krakora, Public Defender, Law Guardian,
attorney; Olivia Belfatto Crisp, on the
briefs).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant C.K. appeals from an order entered by the Family Part finding, by the preponderance of the evidence, that he sexually abused his biological daughter. Before we identify the legal issues raised by defendant, we will briefly summarize how these allegations came to light.

On May 30, 2015, the Division of Child Protection and Permanency (Division) received a referral that alleged defendant was sexually abusing his biological daughter Jane, who was then fifteen years old. The Division assigned two Special Response Unit (SPRU) workers to investigate. The lead SPRU investigator reported the sexual abuse allegations to the Camden County Prosecutor's Office (CCPO). The SPRU workers interviewed Jane,

her biological mother S.K., and her older sister Kate, who was then sixteen years old.

Based on the information revealed through these interviews, the Division executed an emergency Dodd removal[2] of the children and placed them in the temporary custody of a foster family. On June 2, 2015, the Division filed an Order to Show Cause (OTSC) and Verified Complaint charging both defendant and S.K. with child sexual abuse under N.J.S.A. 9:6-8.21(c)(3). The Family Part granted the OTSC, placed the children with a Division-approved foster family, and awarded the Division temporary custody, care, and supervision.

At the same time the Division's investigation and proceedings in the Family Part were going forward, the CCPO began its own parallel criminal investigation of these allegations. Law enforcement agents assisted Division caseworkers to effectuate the emergency Dodd removal of the children. After a CCPO Detective explained the nature of the charges, defendant agreed to submit to a lie detector test on June 1, 2015, at the Lindenwold Police Station. Defendant later refused to submit to the test and

---

[2] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

declined to cooperate with the criminal investigation. The CCPO ultimately arrested and charged defendant on three counts of first degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a), four counts of second degree sexual assault, N.J.S.A. 2C:14-2(b), and two counts of second degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2).

While these criminal charges were pending, the Family Part initially enjoined defendant from having any contact with his daughters, and ordered him to submit to psychological and psychiatric evaluations. On January 25, 2016, the Family Part Judge conducted a fact-finding hearing pursuant to N.J.S.A. 9:6-8.44, and the Division called defendant as a witness to corroborate the allegations of sexual abuse made against him by his daughter Jane. On the advice of his attorney, defendant invoked his right against self-incrimination and refused to testify. At the request of the Deputy Attorney General (DAG) who represented the Division, the Family Part Judge drew an adverse inference of culpability against defendant.

Jane did not testify at the fact-finding hearing. The only evidence of the sexual molestation came from S.K.'s hearsay testimony, who recited what Jane told her about the alleged molestation. In the course of making his factual findings, the judge relied on the adverse inference he drew from defendant's

invocation of his right against self-incrimination as substantive evidence to corroborate Jane's allegations of sexual abuse.

In this appeal, defendant argues the Family Part Judge improperly drew an adverse inference against him when he invoked his right against self-incrimination under the Fifth Amendment to the United States Constitution and this State's evidence rule N.J.R.E. 503 in response to the Division's request to call him as a witness in the fact-finding hearing. This issue has not been addressed in a published opinion by any court in this State. We now hold that a Family Part Judge may not draw an adverse inference of culpability against a defendant who invokes his right against self-incrimination to refuse to testify at a Title 9 fact-finding hearing.

Defendant also claims he received ineffective assistance of counsel. We agree. Defense counsel's performance in this case fell below the standards of competence expected from an attorney admitted to practice law in this State. Counsel was not prepared to provide defendant with a proper defense. His inattentiveness permitted the Division to present legally incompetent evidence to corroborate the allegations of abuse, the dispositive issue in this case. Counsel's ineffective assistance also significantly contributed to the legal error that irreparably tainted the Family Part's findings of abuse against defendant.

## Initial Interview

The first time a Division caseworker interviewed Jane was in her home on May 30, 2015. She was fifteen years old at the time. Jane was hesitant and felt "awkward" talking about her father's behavior. She said her father had touched her breasts over her clothing, and that the abuse began when she was eleven and ended when she was thirteen years old. However, she could not recall specific time frames when the molestation began or ended. When the caseworker asked her if anyone had ever had sex with her, she said "yes" and that it happened "years ago but stopped when she was ten years old." She also claimed that her father had raped her when she was six years old, and continued until she was ten years old, often when her mother was at work.

Jane claimed she told her sister about the abuse when it happened and that her mother also knew. Jane told the caseworker that her mother did not believe her because her father said she was lying. She also told the caseworker that her mother "had a talk" with her father about it "so he would stop." S.K. denied knowledge of the abuse. She claimed that defendant and Jane have a "strained relationship," and attributed her daughter's allegations of sexual abuse against her own father to "becoming a teenager and going through teenage things."

Later that same day, a caseworker accompanied the family to the Hi-Nella Police Station where Jane and her sister Kate met with a Detective from the CCPO. The sisters were interviewed separately. As was the case with her discussion with the Division caseworker, Jane was at first hesitant and felt awkward talking about defendant with the Detective. She eventually told him that the sexual abuse began when she was six years old and continued until she was approximately eleven. When the Detective asked her if she could tell him what happened, she answered: "No. It's . . . I don't actually remember, I have [a] bad memory." She also claimed she could not remember the last time he molested her.

Despite her age, the Detective used drawings of male and female bodies and pointed to specific body parts to ask her where defendant had touched her. Jane told him he touched specific body parts with "his hand and dick." She claimed he kissed her lips while she was laying down, and touched her "boobs" with his hand, and her vagina with his "dick and hand." With respect to her vagina, she claimed he touched her "on the inside." At the time, she did not know whether this was right or wrong.

The molestation occurred in her bedroom, and she estimated it happened "probably less than twenty [times]." She did not tell

her friends or her older sisters[3] about the abuse until she was twelve or thirteen years old. Her sisters did not tell anyone; Jane told the Detective that she believes her mother was not aware of the abuse. When Jane finally told her friends, she told them she was "raped a while ago."

The Detective next interviewed Jane's older sister Kate. Kate told him that she did not remember what Jane told her when Jane was twelve years old. According to Kate, Jane never told her anything about what her father was doing to her. When the Detective pursued the issue more vigorously, Kate said that Jane might have told her about something "a really long time ago," but claimed to have no specific recollection or knowledge about what it was about.

When the Detective interviewed S.K., she again denied any knowledge of sexual abuse. She claimed Jane fabricated these allegations against her father because he had chastised her for being disrespectful to him. According to S.K., Jane told defendant: "how can I respect you when you raped me." S.K. told the Detective that she did not ask defendant about Jane's comment. However, when she asked Jane, she did not reply. At that point,

---

[3] Defendant and S.K. had a third daughter who is an adult and did not reside with them at the time the abuse allegations came to light in May 2015.

S.K. said she decided to "let the comment die." S.K. noted that defendant had "always been mean" to Jane because he suspected she was not his biological child.

Defendant denied the veracity of his daughter's allegations and "became hostile" when he was interviewed by the CCPO Detective. When the Division caseworkers told defendant that they were taking temporary custody of his two daughters on an emergency basis, he told the caseworkers that he "would plead guilty to the charges, even though he was not guilty, if that meant the children could stay with their mother."

The Detective interviewed Jane a second time on June 3, 2015. She again claimed that she was not certain when the sexual abuse began. She estimated that it started when she was six or seven years old and ended when she was ten or eleven. She did not recall how many times she was sexually molested because she has a "really, really bad memory." The video recording shows the Detective reviewed her May 30, 2015 statement with Jane to confirm that her father had "touched her on her boobs and her private part."

During this second interview, Jane made the following statement about defendant: "I heard that the information I'm giving you in here is going to help them decide if my dad goes to jail. He wouldn't survive in jail because of the problem he has with his

knee and stuff." When the Detective asked her what she would like to see done in terms of punishment for her father, she responded:

> Well if they're hurt, if it was someone who actually did it to other people, he only did it to me and he stopped and he learned his lesson and never did it since. And he's really hurt and he's also my dad. And I don't want him to die and because I know he's gonna die in jail.

The Verified Complaint the Division filed in the Family Part on June 2, 2015 included the following statement: "Detective Houten explained that he was not sure, at this time, what charges, if any, were going to be pressed against [defendant] as right now it was [Jane's] word against his word."

The Division referred Jane to the CARES Institute[4] for a medical examination. In a report dated June 23, 2015, Dr. Marita Lind, M.D., states that Jane reported to her medical examination accompanied by her adult sister. According to Dr. Lind, the Division referred this fifteen-year-old girl "for the diagnosis and treatment of any residual to inappropriate sexual contact she may have experienced." Jane repeated her allegations against her

---

[4] The Child Abuse Research Education and Service [CARES] Institute is affiliated with Rowan University. It "accepts referrals from the Division of Child Protection and Permanency, DCP&P (formerly DYFS), county prosecutors' offices, community medical and mental health providers, social service agencies, hospitals and parents." Making a Referral, CARES INSTITUTE, Rowan Medicine, http://www.caresinstitute.org/referrals.php (last visited on Aug. 20, 2018).

father, but Dr. Lind did not find any physical evidence of prior sexual activity.

## Family Part Proceedings

The Family Part conducted a number of case status hearings from June to December 2015. The court ordered the Division to provide Jane and Kate individualized and family therapy. Defendant was indicted on multiple counts of first and second degree sexual offenses and was detained at the Camden County Jail awaiting trial in the Criminal Part. The Division placed Jane and Kate in the physical custody of their adult sister. S.K. cooperated with the Division and completed all court-ordered services, including psychological and domestic violence evaluations. The court initially awarded S.K. unsupervised visitation with the children. The court eventually reunited the girls with their mother, restoring S.K.'s full legal and physical custody. Although he was incarcerated, the court continued to enjoin defendant from having any contact with his minor daughters.

On December 11, 2015, the Family Part Judge held a pre-trial compliance review hearing to address any issues related to the fact-finding hearing. The DAG representing the Division indicated he planned to call S.K. as a witness. This prompted the Law Guardian to make the following statement for the record: "But for

a limited purpose. [S.K. is] not going to be testifying against the father. She's just going to be identifying the children's voices on the audio so that the children don't have to come in." The DAG responded: "Correct, yes." Furthermore, the DAG also confirmed that S.K. did not have "any direct knowledge of [what] actually . . . [is] going on. It's [only] for . . . identification purposes of the videos."

The judge asked defense counsel whether "the evidence that the Division will attempt to bring forth . . . [would] establish the burden [of proof] here?" Defense counsel responded: "Judge, I have reviewed the evidence. I'm not going to concede that [the Division] can prove [its] case based on the evidence." This prompted the DAG to make the following comment:

> THE DAG: Quite frankly, Judge, and no offense [for] interrupting [defense counsel], given the way that the Appellate Division has been handling cases lately, I would prefer to put on live testimony and have a full hearing on this, given the nature of the allegations here.
>
> THE COURT: So we're going to have to call one of the children?
>
> THE DAG: Hopefully I won't have to. Hopefully her statements, Your Honor is going to make the evidentiary ruling that her [presumably referring to Jane] statements are able to go in. They are investigative. If there's a request for cross-examination, I guess we'll have to deal with it at that point. But I have listened to the tapes. I know [defense

12

counsel] listened to the tapes. The child is quite explicit in what she says and heard.

THE COURT: The burden here is of course with the Division. There is no requirement that we have proof beyond a reasonable doubt. But the proof is by the preponderance of the evidence. <u>So wouldn't the child describing the abuse in question on a videotape, doesn't that satisfy the burden here</u>?

DEFENSE COUNSEL: <u>Judge, you could find that testimony to be []credible. Judge, I cannot without committing malpractice concede the case</u>.

THE COURT: Okay. But assuming that comes in, assuming it's not, assuming it's credible, what is it the defense would have? I'm just trying to pre-try the case, that's all.

DEFENSE COUNSEL: No, I understand, I understand. Again, I think the Division, if Your Honor finds that testimony to be credible, then I think we have a tough case.

THE COURT: Okay. Now you could, on your own, call the children as your witnesses and cross-examine them.

DEFENSE COUNSEL: I certainly could.

THE COURT: Do you plan to do that?

DEFENSE COUNSEL: No.

[(Emphasis added).]

Later in the colloquy, defense counsel made the following statement:

DEFENSE COUNSEL: And Judge, so I'm clear and everybody at counsel table is clear <u>my client</u>

<u>will be asserting his Fifth Amendment rights
so we are going to object to him testifying.</u>

THE DAG: That's fine.

THE COURT: So the question then, can the court
take an inference that by exercising his Fifth
Amendment rights in this proceeding, can the
court take an inference of culpability?

THE DAG: I believe Your Honor can.

. . . .

DEFENSE COUNSEL:  Judge, I have researched the
issue and I don't remember what I came up with.

THE DAG:  I have some case law [that] I can
send --

DEFENSE COUNSEL: I suspect that you might be
able to.

THE COURT:  Why don't you send the case law
over.

The Family Part held the fact-finding hearing on January 25, 2016.  The DAG played audio recordings of interviews conducted by the CCPO Detective of Jane and her older sister Kate.  Defense counsel did not object nor ask to cross-examine the girls.  The Division called S.K. as a witness for the limited purpose of identifying the voices on the audio recordings as being those of her daughters Jane and Kate.  Without objection from defendant's counsel, the judge also admitted into evidence a video/audio recording of Jane's second interview with the CCPO Detective.

Thereafter, the DAG questioned S.K. about the verbal altercation she witnessed between defendant and Jane. The DAG asked S.K.:

> Q. And do you recall at that point that your husband told [Jane] that he wanted a little respect?
>
> A. Yeah.
>
> Q. Okay. Do you recall what [Jane's] answer was?
>
> A. I think she said that, how can -- how or would respect somebody who raped you.

In response to a series of leading questions by the DAG, S.K. confirmed that Jane made this statement before the Division and the CCPO began their respective investigations of Jane's allegations of sexual abuse by defendant. S.K. also testified that Jane was currently living with her and was participating in Division-sponsored therapeutic programs. S.K. also testified that Jane had not mentioned the allegations against defendant. Neither defense counsel nor the Law Guardian asked S.K. any questions.

The Division also called Allison Quinn, the caseworker who responded to the referral of sexual abuse on May 30, 2015, and thereafter interviewed Jane. Quinn testified that Jane "basically relayed the same thing that she said in the videotape to me." According to Quinn, when she asked Jane questions about her father touching her, "[Jane] shut down. She gave no eye contact and

15

appeared uncomfortable." Quinn also testified that Jane told her that she told her sister about the abuse. Defense counsel did not cross-examine Quinn at this point. Instead, the following colloquy ensued:

> THE DAG: Your Honor, I am going to renew my request to call [defendant as a witness]. I believe there's going to be an objection from his attorney.
>
> DEFENSE COUNSEL: That's correct, Judge. He's exercising his Fifth Amendment right.
>
> THE COURT: Well doesn't he, himself, have to tell us that?
>
> DEFENSE COUNSEL: If we want to go through that exercise we can do that.
>
> THE COURT: Okay. Is it true that you wish to exercise your Fifth Amendment right to remain silent and not provide any testimony in this case?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Is that true?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Okay.
>
> THE DAG: With that, Your Honor, the Division's going to rest. I am going to ask the court to [draw] a negative inference as to [defendant], which I believe in Belito[5]

[5]   The brief submitted by the Division in this appeal does not cite any case remotely similar to this phonetic spelling. However, we infer the DAG may have been referring to In the Matter of Ippolito, 145 N.J. Super. 262 (App. Div. 1976), rev'd on other

(phonetic), I think that's the case, is permissible. I've previously briefed this issue out in --

THE COURT: Yeah, I recall, you supplied it. Any argument on that?

DEFENSE COUNSEL: Judge, I didn't specifically research that issue but I believe counsel may be correct.

. . . .

THE COURT: . . . We've had a lot of discussions over the years, but at this juncture the court is satisfied that counsel has provided appropriate case law. And in fact it took me years to find appropriate case law and counsel finally found it for us. But that is correct. So there is an inference and you rest?

THE DAG: I rest, Your Honor.

Notwithstanding the Division's decision to rest its case, the judge permitted defense counsel to cross-examine Quinn. In response to defense counsel's question, Quinn confirmed that Jane's medical evaluation conducted at the CARES Institute did not find any physical evidence of sexual abuse. The rest of defense counsel's cross-examination merely reviewed matters covered by Quinn in her direct testimony.

---

grounds, 75 N.J. 435 (1978). In its brief before this court, the Division cites to Ippolito for the proposition that a witness invoking the Fifth Amendment to refuse to testify must have a reasonable basis to fear prosecution. Ippolito, 145 N.J. Super. at 266. The reasonableness of defendant's fear of prosecution was never an issue in this case.

Defendant did not call any witnesses. The next phase of the fact-finding hearing involved only the arguments of counsel and their interactions with the judge in response to his questions. Defense counsel argued that the audio and video recordings of Jane's interview conducted by the CCPO Detective shows Jane made several materially inconsistent statements about the alleged sexual abuse. Defense counsel emphasized that the physician who conducted Jane's medical examination did not find any physical evidence that she had had vaginal intercourse. Counsel argued this was inconsistent with Jane's statement to the Detective "that her father penetrated her with his dick." Defense counsel also argued that the Detective did not ask her whether she understood that she had "a duty to tell the truth right now." The judge agreed that "whoever interviewed the child . . . did an extremely poor job." Finally, defense counsel argued that "under [N.J.R.E.] 603, the child has to be under oath. The child was never placed under oath. The testimony cannot be accepted under [N.J.R.E.] 603."

The DAG argued that the recordings of Jane's interviews with the Detective "wasn't necessarily testimony that was put on. That was the child's out of court statements as to the . . . allegations of abuse." Citing this court's decision in N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427 (App. Div. 2002), the

DAG argued the recordings of Jane's interviews were intended as corroborative evidence. This prompted the following colloquy:

> THE COURT: But it's the same thing over and over again. She says something to the Division, she says something to the person from the prosecutor's office --
>
> . . . .
>
> THE DAG: No. It's the unprompted spontaneous admission that she made to her mother several months before about her father raping her. There wasn't . . . Division involvement at the time. The child made the statement. She said that --
>
> THE COURT: Well not when [S.K. asked] the other question. Were you concerned when your daughter made that statement that she was actually raped or was she just responding.
>
> THE DAG: That is actually included in the 9-7,[6] which mom indicated, and you can bring her back if we need to, saying that she figured that dad would just deny it anyway. That's included in there. We're talking about two separate allegations several months apart. The child's statement is consistent among both the videotape as well as the audiotape recording.

The judge ultimately concluded the Division presented sufficient competent evidence to prove, by a preponderance of the evidence, that defendant sexually abused Jane under N.J.S.A. 9:6-

---

[6] "9-7" refers to a caseworker's report.

8.21(c)(3).  The judge made the following findings in support of this conclusion:

> All right.  This is a difficult case and the way this court has spoken about it shows the court's concerns.  The court has reviewed everything that was submitted.  It's looked at the police report and the prosecutor's report, but certainly it isn't considering those two documents in any way in making a determination.
>
> What is interesting though, is this special nature of the rule that the defendant could have made some comments, and in this environment I would think that if he wanted to he could have.  I don't think anyone is going to rip into him in his criminal case, but other than to say what response to what occurred.  But that is his decision and I know that attorneys generally make that comment.  But here we do not, the case law says we continue on with this case independent a Fifth Amendment issue.  We don't postpone this case for a Fifth Amendment issue, but it is clearly raised here that the defendant does not have a right to have this case postponed.  And his failure to give any comments or any testimony here today does show the court there is an inference that can be drawn.
>
> The court knowing of that inference, and the word should be clear. An inference can be drawn.  And the fact that the child spontaneously made the statement to mom at a time of an argument with dad, and then followed through on it one, two, three times, not as well I'd like it to have been but the child did -- actually one, two, three, the Cares Evaluation, four.
>
> So the child consistently makes the statement again and again, again, and again that she was inappropriately touched and there was contact

between the gentleman's penis and her vagina. And at this juncture the burden must be proven by a preponderance of the evidence. The court sustains that it is so proven and will make a finding of abuse at this time for the sexual act.

## III

## Legal Analysis

Our review of the factual findings made by a judge in the Family Part is limited. N.J. Div. of Child Prot. & Permanency v. K.F., 444 N.J. Super. 191, 200 (App. Div. 2016). We our bound to uphold these findings as long as they are supported by "adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). This deferential standard of review is appropriate because the Family Part judges are presumed to have a "specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 427 (2012).

The judge also has the "opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; [the court] has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008); see also N.J. Div. of Child Prot. & Permanency v. C.W., 435 N.J. Super. 130, 139 (App. Div. 2014). Thus, any "alleged error in the trial judge's

evaluation of the underlying facts and the implications to be drawn therefrom," must be reviewed to determine whether the errors were "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007). However, "that deference is perhaps tempered when the trial court did not hear testimony, or make credibility determinations based on the demeanor of witnesses." N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 350 (App. Div. 2016).

Defendant urges us to reverse and vacate the Family Part Judge's finding that he sexually abused his biological daughter because: (1) the judge decided to draw an adverse inference of culpability against him based on his decision to exercise his Constitutional right against self-incrimination under the Fifth Amendment and N.J.R.E. 503, and refuse to testify as a witness for the Division; (2) the judge's finding of abuse was not based on competent evidence; and (3) his counsel before the Family Part was ineffective and failed to object to the introduction of legally incompetent evidence which ultimately formed the basis for the judge's finding of abuse. We agree with defendant in all three respects.

<u>Adverse Inference of Culpability</u>

Division workers are required "to immediately report to the prosecutor all cases involving suspected criminal conduct on the part of a parent, caregiver, or any other person . . . involving . . . [t]he subjecting or exposing of a child to unusual or inappropriate sexual activity . . . ." N.J.A.C. 3A:10-5.1(b)(2). Furthermore, upon written request, the Department of Children (DFC) and Families <u>shall</u> release the records and reports to "[a] police or other law enforcement agency investigating a report of child abuse or neglect[.]" N.J.S.A. 9:6-8.10a(b)(2).

In <u>DYFS v. Robert M.</u>, 347 N.J. Super. 44 (App. Div. 2002), we noted:

> The statutory scheme and administrative regulations of the Division envisage cooperation between the agency and law enforcement. N.J.A.C. 10:129-1.1(a)4. The Division is obliged to immediately report to the county prosecutor all instances of suspected criminal activity including child abuse or neglect. N.J.S.A. 9:6-8.36a; N.J.A.C. 10:129-1.1(a); -129-1.3(d), -129-1.3(e). If the Division institutes a child abuse complaint in the Family Court, a copy must be sent to the county prosecutor N.J.S.A. 9:6-8.25a. Alternatively, if the prosecutor decides to bring a criminal case, the caseworker must be advised. N.J.A.C. 10:129-1.5(c).
>
> [<u>Id.</u> at 63-64.]

The problem we confronted in Robert M. was based on the absence

of a reciprocal obligation by the prosecutor to cooperate with the

Division. As Judge Collester noted on behalf of the panel in

Robert M.:

> However, no statute or rule requires the county prosecutor to disclose information of an ongoing criminal investigation to the Division. While Title 9 contemplates that actions brought by the Division will continue after referral to the county prosecutor, N.J.S.A. 9:6-8.24, the prosecutor is not restrained from continuing its investigation while the Title 9 action proceeds to trial.

Judge Collester foresaw in Robert M. the looming constitutional

problem that we confront here:

> Parallel investigations and proceedings by the Division and the county prosecutor have resulted in thorny constitutional issues. Defendants may face the Hobson's choice of deciding whether to testify and risk incrimination or remain silent in the face of testimony that could deprive them of custody of their children. Judges must be mindful of the potential for abuse of defendant's civil or criminal procedural rights. However, the fact of parallel proceedings does not invest a defendant with any additional procedural safeguards beyond those provided by constitution, statute or procedural rules.
>
> [DYFS v. Robert M., 347 N.J. Super. 44, 64 (App. Div. 2002) (citations omitted) (emphasis added).]

Since our decision in Robert M., the Supreme Court adopted

new regulations to avoid some of the unintended conflicts that

arise between the Division's Title 9 cases in the Family Part and the County Prosecutor's parallel criminal cases in the Criminal Part. Pursuant to Rule 5:12-6(a), "[w]hen a criminal complaint has been filed against a parent or guardian arising out of the same incident as a [Division] action . . . the Family Part shall determine the nature and scope of parental or guardian visitation[.]" Under Rule 5:12-6(a)(1), when the Family Part schedules "any hearing at which visitation conditions are to be imposed or modified, the court shall provide notice to the county prosecutor."

At this hearing, in addition to the DAG, defense attorneys, and the Law Guardian, the county prosecutor is permitted to appear before the Family Part to present the State's views on the question of visitation. "Prior to any hearing [the Family Part] shall issue an appropriate protective order governing disclosure of confidential Division records consistent with N.J.S.A. 9:6-8.10a." Rule 5:12-6(a)(2)

Under Rule 5:12-6(b), "if there is a criminal investigation of an incident that is the basis for the [Division's" complaint] before the Family Part, the Division "may request that the prosecutor provide any relevant information for use in the action." As we explained in S.M. v. K.M., 433 N.J. Super. 552, 559 (App. Div. 2013), Rule 5:12-6(b) also contains a procedural mechanism

to resolve information-sharing disputes that may arise. However, we must emphasize that <u>Rule</u> 5:12-6 does not impose a reciprocal obligation upon the Division to share information with the County Prosecutor. In our view, the reason for such an omission is made clear in this final statement: "<u>No rights or privileges that may otherwise exist are affected by this dispute resolution procedure</u>." <u>R.</u> 5:12-6(b) [(emphasis added).] Stated differently, the Division's information-disclosure obligations to law enforcement agencies remained as codified in N.J.S.A. 9:6-8.10a(b)(2).

Thus, none of the provisions in <u>Rule</u> 5:12-6 empower a Family Part Judge presiding in a Title 9 fact-finding hearing to enjoin the county prosecutor from using a defendant's self-incriminating statements as part of the State's case in a criminal trial.[7] The Family Part's authority under <u>Rule</u> 5:12-6(a)(2) is expressly circumscribed by N.J.S.A. 9:6-8.10a and b. The plain text of this statute does not authorize the Family Part to take any action to prevent the Division from providing the county prosecutor with a transcript of the fact-finding hearing containing a defendant's

_____

[7] In the criminal trial, the prosecutor would seek to introduce defendant's self-incriminating statements at the fact-finding hearing as admissible evidence of culpability under N.J.R.E 802(b)(1) and N.J.R.E. 803(c)(25).

self-incriminating testimony. In this light, we must now address whether a Family Part Judge may draw an adverse inference of culpability based on defendant's exercise of his right against self-incrimination to refuse to testify as a Division witness at a fact-finding hearing.

Parents have a fundamental constitutional right to raise their children, Stanley v. Illinois, 405 U.S. 645, 649 (1972); N.J. Div. of Youth and Family Servs. v. A.W., 103 N.J. 591, 599 (1986), and "maintain a relationship with [their children], without undue interference by the state . . . ." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 102 (2008). "[A] parent's rights to the care and companionship of his or her child are so fundamental as to be guaranteed protection under the First, Ninth and Fourteenth Amendments of the United States Constitution." E.S. v. H.A., 451 N.J. Super. 374, 383-84 (App. Div. 2017) (quoting Wilke v. Culp, 196 N.J. Super. 487, 496 (App. Div. 1984)).

This court has recognized that these fundamental rights of parents are not without limits:

> However, the constitutional protection surrounding family rights is tempered by the State's parens patriae responsibility to protect the welfare of children. Thus, in order to relieve the tension created by these potentially disparate constitutional principles, the court's authority to remove

A-2734-15T2

> children from the custody of their parents must be exercised with scrupulous adherence to procedural safeguards.
>
> [N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 261 (App. Div. 2002) (emphasis added) (internal citations omitted); see also N.J. Div. of Youth and Family Servs. v. G.M., 198 N.J. 382, 397 (2009).]

As our Supreme Court recently reaffirmed, "[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. S.S., 229 N.J. 360, 381 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). N.J.R.E. 502 provides, in part:

> [A] matter will incriminate (a) if it constitutes an element of a crime against this State, or another State or the United States, or (b) is a circumstance which with other circumstances would be a basis for a reasonable inference of the commission of such a crime, or (c) is a clue to the discovery of a matter which is within clauses (a) or (b) above; provided, a matter will not be held to incriminate if it clearly appears that the witness has no reasonable cause to apprehend a criminal prosecution.

The right against self-incrimination is "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." Hoffman v. United States, 341 U.S. 479, 486 (1951). The trial judge must determine that the

individual seeking to invoke the protection of the Fifth Amendment is "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." United States v. Apfelbaum, 445 U.S. 115, 128 (1980). The Constitutional privilege protects individuals from providing testimonial evidence that he or she "reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Kastigar v. United States, 406 U.S. 441, 445 (1972). The privilege extends "to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant . . . ." Hoffman, 341 U.S. at 486.

When a party in a civil matter asserts the privilege against self-incrimination, the fact-finder may draw an adverse inference of guilt. Attor v. Attor, 384 N.J. Super. 154, 165-66 (App. Div. 2006) (citing Mahne v. Mahne, 66 N.J. 53, 60 (1974)); see also Bastas v. Bd. of Review, 155 N.J. Super. 312, 315 (App. Div. 1978) (holding that the Board could draw an adverse inference where claimant for unemployment benefits asserted Fifth Amendment privilege and refused to testify on facts related to the claimant's qualification for benefits).

In Duratron Corp. v. Republic Stuyvesant Corp., Judge Conford explained why permitting a fact-finder to draw an adverse inference

29

against a party who invokes the right against self-incrimination in civil cases did not undermine the Constitutional protections in the Fifth Amendment:

> The predominant rule has always been that insofar as an adverse inference from failure of a party to testify in a civil cause may tend to visit upon him civil consequences . . . there is no infringement of the party's rights under the Fifth Amendment or similar guarantees.
>
> [Duratron Corp. v. Republic Stuyvesant Corp., 95 N.J. Super. 527, 531 (App. Div. 1967).]

Judge Conford also noted and distinguished those civil cases in which the Supreme Court had not permitted the fact-finder to draw the adverse inference:

> [In Griffin v. State of Cal., 380 U.S. 609 (1965), the Court] held it impermissible in a state criminal prosecution for the court or the state to advert to the defendant's failure to testify.[8]  [In Spevack v. Klein, 385 U.S.

---

[8]  In Griffin, the defendant was on trial for first degree murder and was facing a possible death sentence. Griffin, 380 U.S. at 609.  The defendant "did not testify at the trial on the issue of guilt, though he did testify at the separate trial on the issue of penalty." Ibid.  The trial judge gave the jury the following instructions with respect to his constitutional right not to testify:

> As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as

511 (1967), the Court] decided that to disbar a lawyer for his failure to respond to a subpoena for his records relevant to an investigation of unethical law practice, when such refusal was on grounds of the privilege, was to impose too serious a penalty as the price of his invocation of the privilege . . . . [In Garrity v. N.J., 385 U.S. 493 (1967), the Court] held that a confession was illegally introduced into evidence against a policeman in his criminal prosecution for conspiracy when it was shown that the confession was obtained from him during an investigation under threat of his removal from office if he declined to furnish certain information under claim of his privilege.

[Duratron Corp., 95 N.J. Super. at 532 (internal citations omitted).]

Finally, in Lefkowitz v. Turley, 414 U.S. 70, 75 (1973), the defendants public contractors were summoned to testify before a grand jury and sign waivers of immunity. They refused and invoked their Fifth Amendment rights against self-incrimination. Id. at 76. The Supreme Court held that compelling public contractors to testify before a grand jury by threatening them with the loss of future contracts violated their Fifth Amendment rights against self-incrimination because "the State may not insist that [the defendants] waive their Fifth Amendment privilege against self-

indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable.

[Griffin, 380 U.S. at 610.]

31                                              A-2734-15T2

incrimination and consent to the use of the fruits of the interrogation in any later proceedings brought against them." Id. at 85.

Our Supreme Court followed this line of reasoning in Mahne, 66 N.J. at 54, a matrimonial matter in which the plaintiff sought to obtain a divorce from his wife by charging her with committing adultery with the defendant Rolf Habermann. The Court upheld Habermann's right to invoke his right against self-incrimination and refuse to answer interrogatories propounded by the plaintiff asking his wife and Habermann if they had committed "adultery and fornication." Id. at 55. Both of these acts were "misdemeanors" in 1974 under N.J.S.A. 2A:88-1 and N.J.S.A. 2A:110-1. Ibid. The Court held "it is evident that the defendants could not have been directed to answer the interrogatories nor could they have been fined or imprisoned for their refusal to do so." Id. at 56.

However, the Court in Mahne held the fact-finder could draw an adverse inference from the defendant's failure to answer these questions. In reaching this conclusion, our Supreme Court distinguished the United States Supreme Court's decisions in Garrity and Spevack, by emphasizing "that neither case arose in the present context of private litigation between private parties in which noncriminal sanctions are imposed in aid of orderly pretrial discovery." Id. at 57. The Mahne Court also explained

32

the public policy underpinning permitting the fact-finder to draw an adverse inference in this type of civil proceeding,

> where the civil plaintiff, who is in court voluntarily, invokes his privilege at examination before trial he is unfairly depriving the defendant of "information necessary to his defense" and consequently he may in the court's discretion be subjected to a sanction as severe as dismissal. On the other hand, the civil defendant is in court involuntarily, and when called for pretrial examination he has "no choice but to appear and face questions chosen by his opponent solely for the latter's benefit." Here . . . the trial court may readily draw an adverse inference.
>
> [Mahne, 66 N.J. at 60 (quoting Steinbrecher v. Wapnick, 300 N.Y.2d 564-565 (1969)).]

The same line of reasoning permits the fact-finder in administrative hearings to draw an adverse inference when a party declines to testify. See State Dep't of Law and Pub. Safety v. Merlino, 216 N.J. Super. 579, 587-88 (App. Div. 1987), aff'd, 109 N.J. 134 (1988).

Our Supreme Court and this court have also addressed the issue of imposing "potent sanctions" on individuals for asserting their Fifth Amendment rights against self-incrimination. In State v. Clark, 58 N.J. 72 (1971), when an unmarried mother applied for public assistance, she was told she first needed to file a "bastardy complaint" against the father. Id. at 77. When the trial court later learned the mother was again pregnant by the

same man, they were both prosecuted for "fornication." Id. at 81-2. The Supreme Court held the Fifth Amendment precluded the prosecution of these charges because the mother was required to incriminate herself as a condition to receiving public assistance. Id. at 92.

In Hirsch v. N.J. State Bd. of Med. Exam'rs, 252 N.J. Super. 596 (App. Div. 1991), the plaintiffs were physicians who objected to responding to certain questions in license renewal applications regarding alcohol dependency and mental illness. Id. at 599-601. Writing for the court, then Judge Coleman[9] relied on Spevack and Garrity to hold, "[a]ny licensee who asserts he or she has a well-founded basis to believe that answering [certain questions] would involve self-incrimination respecting drug use or abuse, may assert the privilege against self-incrimination as to the last five years." Id. at 608.

In State v. P.Z., 152 N.J. 86, 92 (1997), the Court granted leave to appeal to consider whether a Division caseworker "must give Miranda[10] warnings to a parent prior to a non-custodial interview related to a child abuse investigation." The defendant in P.Z. provided inculpatory information to the Division

---

[9] Judge James H. Coleman, Jr. was appointed an Associate Justice of the Supreme Court in 1994 by Governor Christine Todd Whitman.

[10] Miranda v. Arizona, 384 U.S. 436 (1966).

caseworker in the course of an interview. Ibid. The caseworker "reported the substance of the statement to the Ocean County Prosecutor's Office. When the prosecutor later filed criminal charges, defendant moved to suppress his statement." Ibid. The Criminal Part Judge conducted a Miranda hearing under N.J.R.E. 104(c), and granted the defendant's motion to suppress the statement. Ibid. This court affirmed the motion judge. Ibid. The Supreme Court reversed. Ibid.

Writing for the majority of the Court in P.Z., Chief Justice Poritz provided a thorough, scholarly analysis of the "two 'separate and distinct' statutes [enacted by the Legislature] to protect children from abuse and neglect and to provide for the termination of parental rights." Id. at 96. She also noted that: "The criminal justice system acts separately, but in tandem with the civil system, to investigate and prosecute those who abuse and neglect children. To the extent that the prospect of criminal prosecution serves as a deterrent to child abuse, the criminal justice system also protects children." Id. at 100. The core facts that makes the case before us here materially different from P.Z. were best summarized by Chief Justice Poritz:

> The circumstances surrounding defendant's interview on April 5 fail to demonstrate the coercive atmosphere and restraint of freedom that comprises a custodial interrogation. Defendant was interviewed in his home, during

the day, with his father nearby. He had complete freedom to come and go as he pleased. Although two caseworkers were present, he was questioned by only one . . . with whom he was familiar. The caseworker's questions were not threatening and the interview was not lengthy. In short, <u>none of the indicia of coercion were present in the circumstances of the interview</u>.

[<u>P.Z.</u>, 152 N.J. at 103 (emphasis added).]

Here, in sharp contrast, at the time of the fact-finding hearing, defendant had been arrested and charged by the CCPO with three counts of first degree aggravated sexual assault, four counts of second degree sexual assault, and two counts of second degree endangering the welfare of a child.[11] Defendant was in the custody of the Camden County Jail when he invoked his Fifth Amendment right against self-incrimination and declined to testify when the DAG called him as a witness in the Division's case in chief. Under these circumstances, the coercive effects the United States Supreme Court found so compelling in <u>Spevack</u> and <u>Garrity</u> pale in

---

[11] Pursuant to N.J.R.E. 201(a), we take judicial notice that defendant was convicted of three counts of first degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a), four counts of second degree sexual assault, N.J.S.A. 2C:14-2(b), and two counts of second degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2). He was sentenced on February 17, 2017 to an aggregate term of fifty-eight years, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. He is currently incarcerated at a Department of Corrections penal institution.

comparison to the prospect of losing the Constitutional right to parent and have a relationship with one's children.

In this Title 9 abuse and neglect fact-finding hearing, it was constitutionally impermissible for the judge to have drawn an adverse inference of culpability against defendant when he exercised his right against self-incrimination and refused to testify as a witness in the Division's case in chief. Based on the related criminal charges pending against him at the time, defendant had a well-founded basis to believe that answering the DAG's questions would violate his right against self-incrimination under the Fifth Amendment and N.J.R.E. 503.

IV

Sufficiency of the Evidence

"A 'fact-finding hearing is a critical element of the abuse and neglect process,' because the court's 'determination has a profound impact on the lives of families embroiled in this type of a crisis.'" N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 87-88 (App. Div. 2008) (quoting J.Y., 352 N.J. Super. at 264-65). Thus,

> [j]udicial findings based on unspecified allegations, hearsay statements, unidentified documents and unsworn colloquy from attorneys and other participants erodes the foundation of the twin pillars upon which the statute rests: (1) that no child should be exposed to the dangers of abuse or neglect at the hands

> of their parent or guardian; and,
> commensurately, (2) that no parent should lose
> custody of his/her child without just cause.
>
> [J.Y., 352 N.J. Super. at 265 (emphasis
> added).]

The Supreme Court has made clear that

> previous statements made by the child relating
> to any allegations of abuse or neglect are
> admissible in evidence; provided, however,
> that no such statement, if uncorroborated,
> shall be sufficient to make a fact finding of
> abuse or neglect. Thus, a child's hearsay
> statement may be admitted into evidence, but
> may not be the sole basis for a finding of
> abuse or neglect.
>
> [N.J. Div. of Youth & Family Servs. v. P.W.R.,
> 205 N.J. 17, 32, 33 (2011) (emphasis added)
> (internal citations omitted) (quoting
> N.J.S.A. 9:6-8.46(a)(4)).]

Here, the Family Part relied on the audio and video recordings of Jane's interview conducted on May 30, and June 3, 2015, the NJ CARES report, the spontaneous statement Jane made to defendant in the course of a heated oral argument, framed as a rhetorical question: "how can I respect you when you raped me;" and the adverse inference of culpability against defendant. Jane, who was nearly sixteen years old at the time of the fact-finding hearing, did not testify. The removal of the adverse inference renders the record devoid of any evidence of corroboration.

The judge's factual finding of sexual abuse against defendant were based entirely on uncorroborated hearsay evidence. Under these circumstances, the abuse and neglect judgment cannot stand.

V

Ineffective Assistance of Counsel

Parents named as a defendant in an abuse and neglect complaint filed by the Division in the Family Part are entitled to effective assistance of counsel. N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 311 (2007); N.J. Div. of Youth & Family Servs. v. B.H., 391 N.J. Super. 322, 346 (App. Div. 2007). The Court in B.R. adopted the standard established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 688, 687 (1984), and later adopted by our Supreme Court in State v. Fritz, 105 N.J. 42 (1987), to determine whether counsel's performance fell below the standard of competence expected of an attorney admitted to practice in this State. Thus, to show ineffective assistance of counsel, a defendant must: (1) identify acts or omissions allegedly showing unreasonable professional judgment, and (2) show that those acts had a prejudicial effect on the judgment. Fritz, 105 N.J. at 58.

The record of the fact-finding hearing shows the judge did not have a full legal understanding of the constitutional implications of drawing an adverse inference of culpability against defendant under these circumstances. At the December 11,

39

2015 pre-trial hearing, defense counsel claimed he had researched the case law concerning whether the judge could draw such an adverse inference against defendant under these circumstances. At the fact-finding hearing conducted on January 25, 2016, defense counsel did not cite any legal authority to support an argument against this critical aspect of the Division's case, seeming to concede the point.

Despite evidence in the record showing that Jane had made numerous inconsistent statements concerning the nature and duration of the sexual abuse, defense counsel did not make any effort to call her as witness. Defense counsel did not argue that the Division's case against his client was based entirely on hearsay evidence, leaving him unable to cross-examine any of the witnesses who provided prerecorded statements that were considered by the judge. Most egregiously, despite his representation to the judge at the pre-trial hearing that he had researched the law on the use of adverse inferences in civil trials, defense counsel seemed utterly unfamiliar with the body of case law this court has discussed here.

We conclude defendant established both prongs of the Strickland-Fritz standard. Defense counsel was ill-prepared to represent defendant at the fact-finding hearing. Defense counsel's conduct fell below the standard of professional

competence expected from an attorney in this State.  Furthermore, defense counsel's lack of preparation materially prejudiced defendant's right to a fair fact-finding hearing, thus satisfying the second prong under Strickland-Fritz.

VI

## Summary

The Family Part Judge erred when he drew an adverse inference of culpability that defendant sexually abused his biological daughter Jane, based only on defendant's refusal to testify as a witness in the Division's case in chief.  Under these circumstances, defendant's decision to refuse to testify was constitutionally protected under the Fifth Amendment of the United States Constitution and N.J.R.E. 503.  Because the judge relied on defendant's silence to draw an adverse inference of culpability to corroborate the child's hearsay statements, the Division failed to prove, by a preponderance of the competent evidence, that defendant sexually abused his daughter Jane, as defined in N.J.S.A. 9:6-8.21(c)(3).

Finally, we conclude that defendant received ineffective assistance of counsel at the fact-finding hearing.  Defendant presented sufficient evidence in the record to establish both prongs of the Strickland-Fritz standard.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2734-15T2

**KOBLITZ, J.A.D., concurring.**

While I concur in the result the panel reaches, I do not agree that a parent is entitled to invoke the right against self-incrimination and decline to testify at a fact-finding hearing in an abuse or neglect matter, because, in my view, the parent's testimony may not subsequently be used by the prosecutor in a parallel criminal proceeding.

Child welfare cases are not the only Family proceedings that may involve a parallel and slower-moving criminal prosecution. Domestic violence trials statutorily involve criminal allegations, see N.J.S.A. 2C:25-19(a) (defining "domestic violence" with reference to specific criminal acts), although as in all Family cases, the standard of proof is not as stringent as in a criminal proceeding, see N.J.S.A. 2C:25-29(a) (requiring proof by a preponderance of the evidence). Although domestic violence records are sealed under threat of criminal prosecution, N.J.S.A. 2C:25-34, domestic violence trials are held in open court, see R. 1:2-1 (requiring that "[a]ll trials . . . be conducted in open court unless otherwise provided by rule or statute"), and thus a defendant's testimony is accessible to the public and to the prosecutor in a parallel criminal prosecution. Similar to child welfare litigation, domestic violence matters cannot be adjourned to accommodate the lengthy criminal process, allowing a defendant

to testify after the criminal matter is closed, thus avoiding criminal exposure. See State v. Kobrin Securities, Inc., 111 N.J. 307, 310, 312-15 (1988) (in the securities fraud context, explaining that defendants could assert their right against self-incrimination in parallel civil proceedings, but could not "indefinitely" stay those proceedings until conclusion of their criminal matters). Domestic violence hearings should be scheduled within ten days. N.J.S.A. 2C:25-29(a). The Legislature has explicitly provided that a defendant's testimony in a domestic violence case may not be used against him or her in a criminal prosecution. Ibid. In a situation where frequently the parties have only their conflicting testimony to present, defendant is thus not precluded from providing a defense. Given the duration and broad range of remedies available under the statute and, as a result, the severe consequences, N.J.S.A. 2C:25-29(b), the Legislature wisely ensured the court would have before it a full record upon which to make a determination.

The best interests of children are the prime concern of our child welfare system. N.J.S.A. 9:6-8.8(a); N.J.S.A. 30:4C-1. Resulting court decisions are important. See In re Adoption of J.E.V., 442 N.J. Super. 472, 481 (App. Div. 2015) (noting that the panel could "think of no legal consequence of greater magnitude than the termination of parental rights"), aff'd, 226 N.J. 90

(2016).  Not only do parents have the Constitutional right to raise their children absent interference from the State, <u>Stanley v. Illinois</u>, 405 U.S. 645, 651 (1972), but also children have the right to a safe and secure home, <u>see</u> <u>Dep't of Children & Families v. E.D.-O.</u>, 223 N.J. 166, 178 (2015) (recognizing, as the most important among children's legal rights, the "right of protection from physical abuse and neglect" (quoting <u>Sponsor's Statement to S. 1217</u> (Apr. 29, 1974))).  Courts need all available evidence to determine the often extremely difficult path to greater safety and security for a child.  The power to separate a child from a parent is an extraordinary power that should not be exercised with unnecessarily limited vision.  <u>See</u> <u>N.J. Div. of Child Prot. & Permanency v. K.S.</u>, 445 N.J. Super. 384, 390 (App. Div. 2016) (holding the trial court erred in refusing to reopen the record to afford the mother an opportunity to testify in a proceeding to terminate her parental rights).  Not only does it benefit the defendant parent, as in domestic violence cases, to present his or her side of the story, but it benefits the children by providing a fuller picture of the situation.

Child protective hearings are nearly always closed.  <u>N.J. Div. of Youth & Family Servs. v. J.B.</u>, 120 N.J. 112, 127-28 (1990).  The records are sealed.  Although the prosecutor and Division do share investigative resources, <u>Div. of Youth & Family Servs. v.</u>

<u>Robert M.</u>, 347 N.J. Super. 44, 63-64 (App. Div. 2002), frequently interviewing children jointly and sharing investigative reports, the transcript of a child welfare hearing is not available to the prosecutor. As my colleagues point out, the Division is required to share its investigative records with the prosecutor. N.J.S.A. 9:6-8.10a(b)(2). But the statute defines the "records" that must be shared as:

> All records of child abuse reports made pursuant to section 3 of P.L.1971, c.437 (<u>C.9:6-8.10</u>), all information obtained by the Department of Children and Families in investigating such reports including reports received pursuant to section 20 of P.L.1974, c.119 (<u>C.9:6-8.40</u>), and all reports of findings forwarded to the child abuse registry pursuant to section 4 of P.L.1971, c.437 (<u>C.9:6-8.11</u>).
>
> [N.J.S.A. 9:6-8.10a(a).]

This definition of records does not include a trial transcript.

Moreover, the right of a prosecutor to participate in a hearing on visitation pursuant to <u>Rule</u> 5:12-6(a) allows the prosecutor to have input only into a condition of release on criminal charges. Ordinarily in a criminal case, no contact with the alleged victim is imposed as a condition of release. <u>See</u> <u>State v. Wright</u>, 410 N.J. Super. 142, 152 & n.3 (Law Div. 2009) (noting a no-contact condition serves the goal of protecting the public). Frequently visitation of some kind with a parent is

4 <span style="float:right">A-2734-15T2</span>

allowed in the parallel child welfare case. Even a neglected or abused child most often benefits from some contact with the perpetrating parent. The Division has the capacity to provide supervised visitation, not commonly available in criminal matters. The Family court determines the visitation accorded a released defendant, but the prosecutor is permitted input in that sole aspect of the Family case, so that the court will have the fullest possible information before making the decision, and the prosecution will be assured the child is safe and its witness protected from possible intimidation.

The limited appearance by the prosecutor in the child welfare case to resolve the issue of visitation does not dictate our decision here. Unlike in the domestic violence context, the Legislature had no need to enact a specific provision to ensure that a parent's testimony could not be used in the parallel criminal proceeding. Child welfare proceedings are conducted in closed courtrooms, inaccessible to the public, including the prosecutor or other interested party. J.B., 120 N.J. at 127-28. Only the court may lift that seal.

The testimony of a parent accused of abuse or neglect should be heard by the court for the protection and benefit of the child. Unlike in most adversarial proceedings, the third party, the innocent child, is the most important party in a child welfare

case. The court should be well-informed before making decisions that will forever affect the child and the family. Here, in my view, the court should have denied the defendant father's application to invoke the right to remain silent and required him to testify, while assuring the father that his testimony could not be used against him in the pending parallel criminal proceeding.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2734-15T2