**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1479-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.Y.J.,[1]

      Defendant-Appellant,

and

K.O.,

      Defendant.

_____

IN THE MATTER OF K.J.
and A.J., minors.

_____

Argued September 16, 2024 – Decided October 10, 2024

Before Judges Sumners and Perez Friscia.

---

[1] We use initials and fictitious names for the parents and children to protect their privacy and the confidentiality of the record.  R. 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FN-14-0055-20.

Beatrix W. Shear, Designated Counsel, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Beatrix W. Shear, on the briefs).

Jessica A. Prentice, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sara M. Gregory, Assistant Attorney General, of counsel; Jessica A. Prentice, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minors K.J. and A.J. (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, of counsel and on the brief).

PER CURIAM

Defendant J.Y.J. (Jane) appeals from the August 2, 2021 Family Part order following a fact-finding determination that she abused or neglected her child, K.J. (Ken), pursuant to N.J.S.A. 9:6-8.21(c)(4). The Law Guardian urges we reject Jane's arguments and affirm the court's order. Having reviewed the record, parties' arguments, and applicable legal principles, we conclude the court's decision was supported by substantial credible evidence and consistent with applicable law. We affirm.

I.

We summarize the pertinent facts and procedural history adduced from the three-day fact-finding trial. New Jersey Division of Child Protection and Permanency (Division) presented the testimony of: two caseworkers, a Center for Evaluation and Counseling Inc. (CEC) evaluator, Tara Devine, M.S. Ed., LAC, and Dr. Robert M. Parinello. Additionally, Jane and her mother testified.

In April 2019, the Division received the first of multiple referrals relating to Jane's care and supervision of Ken. Law enforcement contacted the Division to report a domestic violence incident between Jane and Ken's father, K.O. (Kyle).[2] Jane and Kyle share two children, Ken and A.J.,[3] born in December 2018 and October 2020, respectively. Jane also has a son, J.J. (Joe), born in March 2014, from an earlier relationship with I.P. (Ian).

In May 2014, the Division became aware of concerning incidents involving Jane and Joe. Over six years, the Division received approximately nine referrals regarding Jane and her children relating to homelessness, Kyle's substance abuse, mental illness, and domestic violence by Kyle. The Division

---

[2] K.O. is not a party to this appeal.

[3] The Division also sought out-of-home placement for A.J. Because A.J. is not the subject of this appeal, we do not consider the proceedings pertaining to him.

closed each incident after the investigation, and Jane continued to decline most of the Division's offered services.

In April 2019, Ian moved before the Family Part for Joe's custody, which was granted. That month, after police responded to a call regarding domestic violence against Jane by an intoxicated Kyle, the Division referred her for a forensic assessment at the CEC, which she attended.

Jane also attended a psychiatric evaluation with Dr. Parinello. At trial, Dr. Parinello was qualified as an expert in the field of psychiatry, and the Division moved his three authored reports into evidence without objection. After the initial examination, Dr. Parinello noted "[t]he major question diagnostically . . . [wa]s whether this woman [wa]s delusional or not." He recommended a further evaluation to determine whether she had "a psychiatric condition" and could "benefit from some sort of treatment." He found Jane had "certain qualities which suggest[ed] an underlying bipolar diagnosis." Dr. Parinello concluded she did not present an immediate risk to others. Jane did not attend Dr. Parinello's scheduled follow-up appointment.

On May 28, police again notified the Division of a domestic violence incident between Jane and Kyle. In August, the Office of Temporary Assistance (OTA) terminated Jane's housing assistance due to her failure to participate in

the employment services offered. Jane and Ken then moved into her mother's hotel room with Jane's brother.

The same month, the CEC issued a report, co-authored by Devine in her capacity as a licensed associate counselor,[4] concluding Jane was a high risk for neglecting Ken "due to severe mental illness" and recommending the Division consider an alternate placement. Devine, as a CEC forensic risk assessor, had clinically evaluated Jane. The CEC report, admitted without objection at trial, noted "[h]omelessness ha[d] always been a concern for [Jane] and her family," and at the time of evaluation, she "resided at a motel funded by the . . . OTA." Jane relayed having been diagnosed with attention-deficit/hyperactivity disorder, depression, cystic fibrosis, and chronic asthma. She also advised she was autistic, a high school graduate, and had "four college degrees." Jane explained that after she lost primary custody of Joe: she lost her appetite; "[t]he dog tried to commit suicide" by sticking its head in a water dispenser; and Ken refused to eat and cried all night. She elaborated, Ken "cries all day because

---

[4] N.J.A.C. 13:34- 10.3(b) provides in pertinent part, "The scope of practice of a licensed associate counselor includes, but is not limited to, counseling, counseling interventions, appraisal and assessment, consulting, referral and research activities, as defined in N.J.A.C. 13:34-10.2, under direct supervision pursuant to the provisions of N.J.A.C. 13:34-13."

A-1479-22

[the Division] threatened to take him away from me, right in front of him. . . . [and] [h]e is not stupid." Ken was approximately five months of age at the time of the evaluation. Jane informed the CEC that Ken "started saying Mom at two months" and was "already trying to walk." Jane denied having mental health issues but admitted she suffered a nervous breakdown years earlier. The CEC provided emergency recommendations due to Jane's "disheveled, paranoid and delusional" presentation, concerning comments, and the clinically administered test findings. The report opined Jane was "in need of long term psychiatric and psychotherapeutic services." It stated:

> [Jane] began this assessment on May 15, 2019, at which time she presented with rapid speech, thought process disorganization, paranoia, delusional thoughts, and deficits with reality testing. A subsequent psychiatric evaluation of [Jane] at New Bridge diagnosed her with possible [b]ipolar [d]isorder and/or possible [d]elusional [d]isorder. [Jane] did not complete her psychiatric assessment and therefore, was not prescribed psychotropic medication. [Jane] returned to [the] CEC to complete her forensic assessment on July 26, 2019, at which time she "plead the Fifth" (i.e. refused to answer questions, explaining that she viewed her examiner as a "liar"). Her mental state appeared unchanged at that time.

In September, Jane attended a follow-up evaluation with Dr. Parinello during which she refused to answer many questions. Dr. Parinello noted Jane was hostile and expressed "her belief that she was the victim of a conspiracy"

6

by the Division and the court. Jane stated Ken, an infant, was angry with her, often questioning "where is my brother?" She claimed Ken believed she purposely had Joe removed from the home and expressed anger by pulling her hair. Dr. Parinello reported Jane ranged from "profusely tearful" to "very angry," vacillating between "bolt[ing] from the room" and "lung[ing] forward and rais[ing]" her voice. Dr. Parinello concluded Jane was "acutely psychotic as demonstrated by an elaborate delusional system whereby she is being victimized by a host of agencies." Dr. Parinello observed that Jane began to "incorporat[e] the infant into her persecutory delusional thinking," and he expressed concerns regarding "where [her] psychosis will take her if left unattended." He explained "in a psychosis where an infant becomes part of the delusion system," there "is a risk of an adverse outcome." His mental health status exam report indicated Jane had psychosis, not otherwise specified (NOS), and ruling out delusional and bipolar disorders was necessary.

The same day, after Dr. Parinello called the Division expressing his immediate welfare concerns, the Division's Special Response Unit checked on Jane and Ken. Jane claimed Ken, who was eight-and-a-half months old at the time, was speaking in full sentences and asked, "where is my brother?" She admitted Ken was not up to date on his physical exam and vaccines because he

7

did not have any medical insurance. Further, she claimed Joe's paternal grandmother was trying to sell Joe in Peru. Jane continued to deny having any mental health issues. The caseworkers determined Ken "was safe in the care of his mother and grandmother," and "[t]here was nothing to indicate [Ken] was in imminent danger."

The next day, on September 11, Dr. Parinello again expressed concerns Jane "was actively psychotic and delusional." Division caseworkers again interviewed Jane and her family, this time meeting at a fast-food restaurant. During the interview, Jane was "very agitated" and "anxious." She raised her voice at the Division workers, yelling profusely. Jane admitted, "I'm depressed, stressed out[,] and you all are making it worse." A caseworker requested Jane sign a release permitting Dr. Parinello the ability "to speak with [her] medical doctor" and relayed medication could not "be prescribed without the [p]sychiatrist having the ability to consult with [her] physician." Jane only signed a Division "HIPPA form." Further, she refused to return to Dr. Parinello.

The Division continued to contact and evaluate Jane and Ken over the next few days. Jane continued to refuse psychiatric services and to sign the medical releases. She also failed to bring Ken to a pediatrician for a necessary check-

up, though the Division had advised they would pay for the doctor's appointment.

The Division filed an order to show cause and verified complaint seeking temporary custody of Ken. On October 17, the Division effectuated an emergency removal of Ken due to Jane's mental health condition and refusal to participate in services. The Division placed Ken in a relative resource home with Kyle's brother and his girlfriend. During the removal, Jane threatened to punch the Division supervisor and lunged at him. On October 21, the court granted the Division continued custody of Ken, finding Ken's placement with Jane would be contrary to his welfare under N.J.S.A. 30:4C-11.2.

In December, Jane attended another evaluation with Dr. Parinello; however, she again refused to cooperate. The evaluation ended after Jane raised her voice, threatened violence, and lunged at Dr. Parinello. Because of her behavior, he called the police to have her removed, noting her "increas[ed] paranoia" and inability to "regain control" of herself.

Jane testified during the factfinding hearing she had not refused Division and CEC services. Further, she denied suffering from any mental health issues. Jane claimed that during her second evaluation with Dr. Parinello, he asked her no mental health questions. She alleged Dr. Parinello called the police because

9

she was on the phone during her evaluation, not because of any aggressive behavior. Her mother testified Jane does not have a "mental illness" and does "a good job as a mother."

On July 27, 2021, the court issued an oral opinion, followed by an order on August 2, finding the Division demonstrated by a preponderance of the evidence Jane's "failure to recognize or engage in treatment for her mental health condition" constituted a "failure to exercise a minimum degree of care, which placed and continue[d] to place [Ken] in imminent danger of substantial risk." The court found "the credible, unrebutted, factual evidence regarding statements directly attributable to [Jane] would lead any lay person to question [her] mental health." The court added, "there is also substantial and persuasive expert evidence and opinion." Finding Devine's testimony credible, the court accepted that Jane was "in need of completing her psychiatric evaluation" as well as "long-term . . . services." The court noted Jane failed to proffer a mental health expert to rebut the Division's evidence. The court additionally found Dr. Parinello's testimony reliable, stating he "testified credibly and consistent with the findings in his report." While the court agreed with Jane's closing argument that "expert evaluators must be trained in cultural sensitivity" and it was relevant

10

to her as a Black woman, the court noted no evidence demonstrated a "lack of cultural awareness" or "implicit bias."

The court accepted the experts' testimony finding that Ken "was in imminent danger due to Jane's compromised mental health, including severely compromised judgment, delusional disorder and being floridly psychotic." Further, the court concluded:

> [Jane] denies having mental health concerns and this is the problem that remains. This untreated mental health condition is a danger to [Ken] and the [c]ourt finds that [Jane]'s failure to recognize or engage in treatment for her mental health condition as described earlier is a failure to exercise a minimum degree of care, which placed and continues to place [Ken] in imminent danger of substantial risk of harm.

The court highlighted Jane's failure to accept the Division's services offered. Additionally, the court found the history of domestic violence between Jane and Kyle "pose[d] an imminent risk to [Ken] as well." The court's August 2 order provided the Division proved by a preponderance of the evidence Jane abused or neglected Ken pursuant to N.J.S.A. 9:6-8.21(c).

On September 24, 2021, the court ordered the termination of Jane's parental rights to Ken and awarded guardianship to the Division for permanent placement and adoption. Thereafter, the court entered an emergent order permanently changing Ken's placement to Kyle's parents' home. On October 19,

11

the court entered a permanency order permitting reunification. On July 27, 2022, the court ordered physical and legal custody of Ken to Jane. Following reunification, the court terminated the litigation on December 5.

On appeal, Jane argues the court erroneously: found abuse or neglect without proof her conduct actually or imminently impaired Ken physically, mentally, or emotionally; permitted Devine to opine as a psychological expert; relied on Dr. Parinello's unrecognized diagnosis of NOS and "rule out opinions"; and relied on expert opinions authored without consideration of accurate background information.

## II.

It is well established that "[a]ppellate courts defer to a trial court's factual findings when they are 'supported by adequate, substantial, and credible evidence.'" N.J. Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 373 (2024) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "[W]e apply a deferential standard in reviewing the family court's findings of fact because of its superior position to judge the credibility of witnesses and weigh the evidence." N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 368 (2021). Family courts "are presumed to have a 'specialized knowledge and experience in matters involving parental relationships and the best interests of

children.'" N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 261 (App. Div. 2018) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012)). A trial court's findings are accorded deference "unless it is determined that they went so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We owe no deference to a court's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

"The prevailing concern in abuse and neglect cases is the best interests of the child." N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 146 (App. Div. 2016); see also N.J.S.A. 9:6-8.8(a) (providing that under Title Nine, children's safety is "of paramount concern[,] and the best interests of the child shall be a primary consideration"). "The purpose of a fact-finding hearing in an abuse or neglect proceeding is not to assign guilt to a defendant, but to determine whether a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.44." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 328 (App. Div. 2011). "An analysis of a parent's conduct must account for the surrounding circumstances." N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180 (2015).

An abused or neglected child is one:

whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof. . . .

[N.J.S.A. 9:6-8.21(c)(4).]

"[T]he phrase 'minimum degree of care'" under the statute "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 178 (1999); see also N.J. Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 305 (2011). "Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." G.S., 157 N.J. at 178. "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." Id. at 181-82. "Absent proof of actual impairment, 'the critical focus is on evidence of imminent danger or substantial risk of harm.'" B.P., 257 N.J. at 376 (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013)).

Our Supreme Court addressed the definition of imminent danger, elucidating that:

> Per their plain meanings, "imminent" means "threatening to occur immediately; dangerously impending . . . [or] about to take place," Black's Law Dictionary 898 (11th ed. 2019), and "danger" means "peril; exposure to harm, loss, pain, or other negative result," id. at 493. Further, Black's Law Dictionary defines "imminently dangerous" as "reasonably certain to place life and limb in peril." Id. at 494.
>
> [Id. at 376 (alterations in original).]

Further, when interpreting evidence regarding imminent danger, courts must not "fill in missing information on their own or take judicial notice of harm." N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 469 (App. Div. 2014) (quoting A.L., 213 N.J. at 28).

"A parent who fails 'to exercise a minimum degree of care' by unreasonably allowing harm to be inflicted on a child is accountable under the statute." J.R.-R., 248 N.J. at 370 (quoting N.J.S.A. 9:6-8.21(c)(4)). The Division bears the burden of proving by a preponderance of the evidence a parent abused or neglected a child. Id. at 369. To sustain that burden of proof, the Division may seek to admit "competent, material and relevant evidence." Ibid. (quoting N.J.S.A. 9:6-8.46(b)).

A-1479-22

III.

Jane's contention that the court erroneously found her conduct constituted abuse or neglect because the Division did not prove actual or imminent impairment of Ken, is belied by the record. Preliminarily, it bears acknowledging that a parent's mental health condition does not by itself dictate a finding of abuse or neglect. See F.M., 211 N.J. at 450 ("Mental illness, alone, does not disqualify a parent from raising a child."). However, unaddressed mental illness of a parent may create an environment in which the parent is incapable of safely caring for her or his children. See N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 439-40 (App. Div. 2001). For the Division to establish a substantial imminent risk of harm to the child, there must be proof the "parent refuses to treat his [or her] mental illness, the mental illness poses a real threat to a child, and the other parent . . . is unwilling or incapable of following court orders to shield [his or] her child from that danger." See F.M., 211 N.J. at 450-51.

The court found Jane committed abuse or neglect because she placed Ken in imminent danger by failing to exercise the requisite minimum degree of care. Ken, an infant in Jane's primary care, was at immediate risk because she failed to exercise reasonable conduct in addressing her established serious mental

16

health condition. As the court noted, the Division credibly demonstrated Jane's "psychotic" disorder "compromised [her] mental health, . . . severely compromis[ing] [her] judgment." Specifically, Jane's months-long continuous refusal to accept the Division's offered psychiatric services placed Ken at immediate risk. Additionally, Jane refused to sign the necessary medical releases to enable: a psychiatric professional assessment, which included her prior psychiatric history; mental health services contemplating her current conditions; and possible medication recommendations.

After noting Jane's "denial" of mental health concerns, the court specifically found her "failure to recognize or engage in treatment for her mental health condition . . . is a failure to exercise a minimum degree of care" for Ken. As the court correctly found, Jane's conduct in failing to address her untreated mental health condition had already affected Ken and placed his "physical, mental, [and] emotional conditions" in further immediate danger. Jane's refusal to accept "offered services to aid her in securing housing, public assistance, or medical care for Ken" substantiated his imminent impairment.

It is well-established that when "determining whether or not a child has been abused or neglected, the trial court must base its findings on the totality of the circumstances." V.T., 423 N.J. Super. at 329. Here, the court determined

the credible evidence established an immediate risk to Ken because of the continued residential instability, the reports of domestic violence by Kyle, and Jane's failure to ensure proper pediatric care. We discern no reason to disturb the court's abuse and neglect finding, as the record amply supports the court's specific findings of impending risk to Ken based on Jane's conduct.

We also reject Jane's contention that the court erroneously based its abuse or neglect findings on unsupported and improperly considered expert testimony by Devine. Appellate courts "rely on the trial court's acceptance of the credibility of the expert's testimony and the court's fact-findings based thereon, noting that the trial court is better positioned to evaluate the witness'[s] credibility, qualifications, and the weight to be accorded [his or her] testimony." In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999). Therefore, we exercise limited review of a trial court's decision to admit or exclude expert testimony. See Townsend v. Pierre, 221 N.J. 36, 52 (2015) ("The admission or exclusion of expert testimony is committed to the sound discretion of the trial court."); Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008) (stating trial court's evidentiary decision to admit expert testimony is reviewed for an abuse of discretion).

The court found the Division's experts, Devine and Dr. Parinello, were both qualified experts who credibly established Jane's "untreated mental health

condition." Devine attested to being a "licensed associate counselor" with experience in "perform[ing] forensic evaluations and therapy." In conducting the forensic assessments, she was experienced in providing "psychological testing[,] inventories[,] and therapy." She held a bachelor's degree in human services, which she testified was "based on psychology and social services." She also held a master's degree in school counseling and had sixty "credits in mental health counseling." To obtain her license, she passed the National Counselor Examination. At trial, Jane's counsel consented to Devine's qualification regarding "information about [Jane's] clinical interview[,] . . . the tests . . . administered[,] and [Devine's] findings."

Although counsel consented to Devine's qualifications, the court nonetheless copiously made sufficient findings regarding her qualifications, stating "the fields in which she is going to testify to are such that the art is in a sufficiently reliable status and that the witness's obvious experience, she's conducted over 200 of these type of forensic assessments, 100 leading up to the one that is at issue" here. The court further found Devine's "curriculum vitae and testimony outline the extensive training that she has undergone prior to conducting these team assessments," concluding she was "an expert in the field" and "allow[ing] her to testify, as her specialized knowledge w[ould] assist the

19 <span></span>

trier of fact." The record supports the court's qualification of Devine as an expert in the field of forensic risk assessments providing psychological testing. Therefore, we discern no error in the court's permitting Devine to testify, within a "reasonable degree of psychological certainty," to the assessments and evaluation of Jane that she performed. See N.J. Div. of Child Prot. & Permanency v. I.B., 441 N.J. Super. 585, 596 (App. Div. 2015) (recognizing "Family Part judges regularly qualify experts in psychology and psychiatry and hear the opinion testimony those experts offer in a variety of contexts," and therefore those judges "are more than capable of evaluating the opinions of experts.").

We further observe, Dr. Parinello's unrefuted medical opinion alone established Jane's psychotic mental condition warranted immediate services and intervention as her untreated mental health conditions placed Ken at imminent risk. Thus, the court's findings were sufficiently supported regardless of Devine's testimony.

Jane next argues the court erred in relying on Dr. Parinello's psychiatric opinion she had a psychosis, NOS because the diagnosis of an NOS mental illness does not establish a "specific mental disorder." Specifically, she contends the court should have disregarded Dr. Parinello's opinion because NOS

refers to a group of mental disorders; thus, his diagnosis was incomplete without ruling out delusional and bipolar disorders. We are unpersuaded. Dr. Parinello's unrefuted opinion was that Jane was "psychotic." We note the record demonstrates Jane was uncooperative in completing Dr. Parinello's evaluation and had to be removed from his office by the police. He explained an observer could "see[] and appreciat[e] psychotic symptomatology" and that he "certainly found [Jane] to be very delusional." Further, he found Jane "was suffering from worsening psychosis over the time span which [he] worked with her" and she "really needed hospital stabilization . . . given her denial of having any condition and her refusal of treatment." "Many psychoses are cyclic, others are unremitting and worsen over time." He clarified an "extended assessment" could rule out the other disorders, but that Jane suffered from psychosis, NOS. The court's reliance on Dr. Parinello's psychiatric diagnosis Jane was suffering from a psychotic state is sufficiently established by the record.

Finally, Jane argues the experts' opinions were invalid because the Division failed to disclose important background information and the experts "misinterpreted [Jane's] statements." Each expert provided an adequate foundation for their opinion. N.J.R.E. 703 requires an expert opinion be grounded in "facts or data derived from (1) the expert's personal observations,

or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Polzo v. County of Essex, 196 N.J. 569, 583 (2008) (quoting State v. Townsend, 186 N.J. 473, 494 (2006)). We discern no merit to Jane's argument that the experts were not provided sufficient background information and misinterpreted her statements. The nature of each experts' mental health evaluation allowed her the opportunity to disclose relevant information and participate in the assessments. Therefore, we conclude the court committed no abuse of discretion considering Dr. Parinello's and Devine's expert opinions. The court's finding that the Division met its burden of proof establishing abuse or neglect was sufficiently supported by the record.

To the extent we have not otherwise addressed any of Jane's arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION