# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4045-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.I., (deceased)

     Defendant,

and

D.O.,

     Defendant-Respondent,

and

J.B.,[1]

     Defendant-Appellant.

_____

---

[1] We use initials and fictitious names to protect the identities of the children and parties and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

IN THE MATTER OF H.B., J.B.,
and F.B., minors.

_____

Argued December 16, 2024 – Decided June 5, 2025

Before Judges Gummer, Berdote Byrne, and Jacobs.

On appeal from the Superior Court of New Jersey,
Chancery Division, Family Part, Hunterdon County,
Docket No. FN-10-0107-20.

Debra M. Johnson argued the cause for appellant.

Alicia Bergman, Deputy Attorney General, argued the
cause for respondent Division of Child Protection and
Permanency (Matthew J. Platkin, Attorney General,
attorney; Sara M. Gregory, Assistant Attorney General,
of counsel; Mary L. Harpster, Deputy Attorney
General, on the briefs).

Deric Wu argued the cause for respondent D.O.
(Jennifer N. Sellitti, Public Defender, attorney; Deric
Wu, of counsel and on the briefs).

Cory H. Cassar argued the cause for the minors H.B.
and F.B. (Jennifer N. Sellitti, Public Defender, Law
Guardian, attorney; Meredith Alexis Pollock, Deputy
Public Defender, of counsel; Cory H. Cassar, of counsel
and on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian,
attorney for minor-respondent J.B. (Meredith Alexis
Pollock, Deputy Public Defender, of counsel; Todd
Wilson, Designated Counsel, on the brief).

PER CURIAM

2

In this appeal, the Division of Child Protection and Permanency ("DCPP") charged defendant J.B. ("Jerome") with abuse and neglect of his three children: H.B. ("Helen"), now eighteen years old; J.B. ("Jay"), now seventeen years old; and F.B. ("Farrah"), now thirteen years old. DCPP alleged Jerome emotionally, verbally, and physically abused the children and exposed them to witnessing domestic violence against the children's mother, T.I., ("Tanisha"), who passed away in March 2017, and stepmother, D.O. ("Denise").

Following a fact-finding hearing, the trial court on February 8, 2021, entered a written opinion, finding defendant had physically and emotionally abused and neglected his three children, based on, among other things, his physical discipline, verbal abuse, and their witnessing his controlling behavior towards Tanisha and Denise. The court entered an order memorializing its opinion on February 12, 2021. The court initially approved DCPP's permanency plan to reunify the children with Jerome. However, Denise subsequently moved to be declared the children's psychological parent. On April 12, 2022, the court adjudicated Denise as the children's psychological parent. Following a best-interest hearing, the court on May 31, 2022, granted Denise sole legal and residential custody of the children, allowing Jerome unlimited visitation as

3

agreed upon by the children. Although Jerome lists numerous orders[2] in his notice of appeal and fails to include other orders of significance, on appeal he argues the trial court erred in finding he had abused and neglected his children, in finding Denise is the children's psychological parent, and in granting sole legal and physical custody of the children to Denise.

Before oral argument, we asked the parties to provide supplemental briefing as to whether Helen, who is now eighteen years old, was subject to the court's jurisdiction. The parties all agree Helen is not currently under the jurisdiction of the court with respect to custody or parenting-time issues. Those issues will also become moot as to Jay in July 2025, when he becomes eighteen years of age. Therefore, issues with respect to the trial court's determination of

---

[2] Jerome lists the following orders in his second amended notice of appeal: the February 12, 2021 order finding he had abused and neglected his children; the May 31, 2022 permanency order continuing current placement with plans to reunify the children with Denise, the children's psychological parent, and requiring additional counseling and therapy to address concerns regarding the relationship between Jerome and children; the May 31, 2022 order finding it in best interest of the children to be reunified with Denise, and granting her sole legal and residential custody of the children with unsupervised visitation with Jerome at the children's discretion; and the July 18, 2022 order terminating the litigation. He does not list the April 12, 2022 order adjudicating Denise as the children's psychological parent. Because issues regarding the April 12, 2022 order were substantively briefed by all parties, and no objection was raised, we address those issues on the merits in this opinion.

psychological parent, custody, and parenting time are limited to Farrah and to Jay, until he becomes eighteen in July.

We also note, after the appeal was filed, we became aware Jay had returned to live with Jerome, and Jay's law guardian withdrew its briefs, taking no position with respect to any of the issues before us on appeal. We were also advised Jerome and Denise are currently involved in a matter filed in the dissolution docket involving past-due child support and parenting time.

After applying all prevailing legal principles to the facts in the record before us, we conclude DCPP established abuse and neglect of all three children by a preponderance of the evidence, as aptly set forth by Judge Julie M. Marino, and affirm the finding of abuse and neglect. We also conclude sufficient, credible evidence in the record exists to support the trial court's finding that Denise is the children's psychological parent and the best-interest determination that awarded her custody of the children. Therefore, we affirm all orders before us. To the extent there are current custody and parenting-times issues before the trial court, or physical custody of Jay has changed since the orders briefed on appeal were entered, we make no findings with respect to those subsequent issues, and instead affirm the orders of the trial court that are before us in this appeal as of the dates those orders were entered.

A-4045-21

I.

We glean the following facts from the voluminous record before us on appeal. DCPP had investigated the family on three prior occasions for domestic violence between the parents and abuse of the children. Per the DCPP investigation, both Tanisha and Jay reported that Jerome had hit them.

The second and third DCPP investigations occurred on August 26 and 28, 2015, involving allegations of physical abuse by Jerome against Helen and Jay. DCPP's investigation revealed Tanisha had obtained a TRO against Jerome, and he had been subsequently arrested for harassment. Tanisha, Jay, and Helen all claimed Jerome had physically abused Tanisha and Jay and emotionally abused the entire family. Jerome denied the allegations and claimed Tanisha had encouraged the children to lie. However, during the investigation, Tanisha had presented DCPP with an audio recording that captured Jerome yelling at Jay, sounds of Jerome purportedly hitting Jay with a belt multiple times, and sounds of Jay crying. Acknowledging this recording, Jerome admitted he had struck Jay "once" with a belt but maintained the other sounds on the recording were of him "hitting the belt on the table," and not him striking Jay repeatedly.

On November 30, 2015, DCPP filed a complaint against Jerome for abuse and neglect of the children, but on September 14, 2016, DCPP terminated

proceedings, modifying the "substantiated" finding to "established." The parents subsequently shared legal custody of the children, with physical custody awarded to Tanisha and alternate weekend parenting time with Jerome.

In 2016, Tanisha was diagnosed with an illness, which was later deemed terminal. During the present investigation, Jerome claimed he did not learn of this diagnosis until later that year and did not know her diagnosis was terminal until after she had passed away in March 2017. That claim is contradicted by statements he made to DCPP investigators in August 2016 that he knew of Tanisha's diagnosis and had been processing it in therapy. Jerome insists on appeal he did not know she was terminally ill.

The children began residing with Jerome in December 2016, when, following a weekend visit, Tanisha never retrieved the children. Helen and Jay testified that a family friend had attempted to pick them up on Tanisha's behalf, but Jerome refused to release them to anyone but their mother. Jerome claimed once the children began residing with him, they never asked to visit Tanisha or call her. Helen and Jay testified Jerome had prohibited them from visiting or calling their mother. In fact, Helen stated Jerome had forbidden them from even mentioning their mother at home, and Jay said they followed his rules because they feared him.

7

Jerome acknowledged the maternal family had attempted to facilitate a visit for the children at the hospital. He said that Tanisha told him the children were not authorized to visit her, but Tanisha's stepsister had informed him Tanisha was in a coma and asked for the children to be present when Tanisha was removed from life support. Jerome refused, stating that the children were "too young to witness something like that." The following morning Tanisha's stepsister came to the home to take the children to the hospital, but Jerome again refused, prompting Tanisha's siblings to file a police report against him.

The children saw their mother once more in February 2017. Helen testified that she had "snuck" a call to her mother while Jerome was at work, but he found out and yelled at her and threatened to kick her out of the home. However, the following day he permitted the children to visit their mother. Helen testified the visit lasted an hour, and Tanisha told them she was getting better and would see them "on Monday." However, Tanisha died shortly after, on March 1, 2017.

Jerome testified the maternal family did not notify him of her death until March 5, 2017, at which point he immediately informed the children. Both Helen and Jay testified they did not learn of their mother's death until a week later, with Helen stating she learned the news from a classmate on the bus. Jay

A-4045-21

said when Jerome had told them the news they began to cry, and Jerome yelled at them to "stop crying" because they "knew she would die." Jerome refused to allow the children to attend their mother's funeral.

According to Denise, she met Jerome in March 2017. She testified she initially declined Jerome's requests to date but had agreed to help care for the children because he was in between nannies. In April 2017, Denise moved into the family home with her son, "Laddie." Denise testified she was never paid for this work. Jay also testified Denise first came to them as a nanny, but Jerome denied she ever worked for the family. The parties' romantic relationship began in the summer of 2017, and they married on May 26, 2018.

Denise stated her relationship with the children was initially strained, noting they were always sad and did not talk much. She later learned their mother had only recently passed away. Denise testified Helen had kept her distance, but they became closer once Denise reassured her, she was going to take care of and support her. Denise described Jay as being initially "reserved" and said Jerome had told Jay lies about her. She described her attempts to forge a relationship with him and said Jay eventually opened up to her. In contrast, Denise testified she immediately connected with Farrah, who was very talkative

9

and comfortable with Laddie. She said Farrah initially called her "mom," but she would correct her, and all three children called her "Auntie."

Helen and Jay described a positive relationship with Denise. Helen said Denise was similar to her mother, in that they both were "strong" for the children and encouraged Helen to support her siblings.

Denise testified she helped prepare the children for school in the morning and initially had walked them to the bus stop, but at some point, Jerome took over this task because he did not want her to interact with the families at the bus stop. During the day she cleaned the home, cared for Laddie and Farrah (before Farrah began attending school), and then cared for the children after school and prepared their meals. She described the various games and activities she engaged in with the children and said she cooked with the children, taught the girls about makeup, and styled the girls' hair. For discipline, Denise said she spoke to the children about right and wrong, gave rewards, and took away their electronic devices.

The children and Denise testified consistently about their volatile relationship with Jerome. Helen described living with Jerome as "toxic," stating she "was on eggshells" all the time, trying not to upset him. She said he would get upset over little things and "sometimes he would just wake up mad." She

10

said he once yelled at her and Jay to stop laughing when watching television and then came upstairs and "beat" Jay.

Jay similarly testified Jerome "was very abusive," "yell[ed] over small things," and "was very physical." Both Helen and Jay testified he regularly called Jay "stupid," threatened to kick Jay out of the home, and regularly physically disciplined Jay. Helen and Jay testified Jerome's physical discipline included punching, slapping, and hitting him with objects such as a belt buckle or back scratcher. Both said Jerome physically disciplined Jay for different reasons, such as forgotten homework assignments, reciting a prayer incorrectly, or leaving his jacket at school.

Helen testified she had witnessed Jerome abusing Tanisha, stated she saw him choke her, heard him yell at her and hit her, and saw a bruise on her mother's leg. Jay also recalled seeing Jerome threaten Tanisha, yell at her, and hit her, stating it was "scary" living with Jerome. Helen stated Jerome had hit her too, though not very often. For instance, both Helen and Denise testified when he was punishing Jay, Jerome would direct Helen to bring the belt, and if Helen dawdled, he would hit her. Helen also described a disagreement she had had with Jerome, after which he ignored her and then, while walking her and Jay to the bus stop, he yelled at her and slapped her. Helen said when Jerome was

11

upset, he threatened to disown her or send her to Africa, told her he did not like her, and said she was a bad example for her siblings. Helen stated she often stayed in her room to avoid Jerome. She said Jerome's threats and discipline happened almost daily. Both Helen and Jay testified he would insult Tanisha when he was upset with them, calling her "stupid," saying it was "good that she died," or telling Jay to "not be a liar like Mom." Jay corroborated this testimony.

Jay, Helen, and Denise all testified about an incident where Jerome repeatedly hit Jay on the head one day, and it was so painful Jay had a headache all day at school and was crying.

Denise's testimony corroborated the testimony of the children, stating Jerome yelled at or threatened the children almost daily. She reported he would get upset over minor things—such as the children eating too slowly, having trouble with homework, and misplacing a belonging—and he punished Jay more severely, with the physical discipline consisting of slapping, pushing, and hitting him with a belt. She said he frequently threatened to disown Jay and Helen or throw them out of the house, noting he often lumped them together, so if one got in trouble, then the other did as well. She said Jerome often called Helen names, yelled at her, and accused her of being against him. She said Jerome was upset with Helen after she told Denise about his treatment of her mother,

A-4045-21

and he yelled at her and said things like, "I regret the day I gave birth to you" and "are you sure you are my daughter?"

Helen, Jay, and Denise all described Jerome as favoring Farrah, buying her toys and candy. Denise opined it was because Farrah had not sided against Jerome during the parents' custody dispute. However, Helen recalled two instances when Jerome physically disciplined Farrah.

Denise testified Jerome did not treat her well, both before and during the marriage. She said he often became angry with her for "any little thing" that happened in the home and, when he was upset with her, he punished both her and Laddie. He often ignored both of them and instructed the children to do the same, threatening to kick the children out of the home if they spoke to her or Laddie. Denise also described one incident when he pushed her against a wall and broke her phone. She said because of his treatment, she had left him twice prior to their ultimate separation.

Helen similarly testified when Jerome was fighting with Denise, he would tell the kids to ignore her and Laddie and stay away from them. Jay also said Jerome would ignore Denise for extended periods of time. Helen testified Jerome treated Denise the same way he had treated Tanisha, yelling at her, insulting her, and disparaging her family. Jay similarly testified Jerome

constantly yelled at Denise—calling her a prostitute and threatening to send her back to Africa.  They both also testified that Jerome would hit Laddie, yell at him, and pull his ear.

In addition, Denise claimed Jerome discouraged her from working, did not let her get a driver's license, limited her communications with her family, and did not let her go to the store alone.  Jerome denied these claims.

In January 2019, Helen and Jay separately went to their guidance counselors to report Jerome's behavior.  Both children said they had felt compelled to speak to the counselors that day because Denise had talked about leaving the home permanently, and they did not want to remain in the home without her.  This initiated the DCPP investigation, which led to the abuse-and-neglect finding.

Denise and Jerome separated on January 12, 2019.  Denise, Helen, and Jay all provided similar accounts of what transpired on that date.  Jerome had been out with the children and when they came home, Laddie ran to greet them.  Jerome shouted at him to move away from them, and when Laddie began crying, he called Laddie a "bastard child," yelled at Denise to take him out of his home, and said he did not want Laddie around his children.  Denise testified she was holding Laddie on the steps, and when she spoke back to him, Jerome responded

14

by calling her a prostitute and an ingrate and saying he wanted her out of the home. When Denise refused to leave, Jerome kicked and pushed her on the staircase. Denise called the police, who removed Jerome from the home that night.

The police arrested Jerome for domestic violence against Denise, and she obtained a TRO against him. The police also notified DCPP, initiating a second investigation against Jerome. The court ordered the children to remain with Denise. Jerome and Denise resolved the domestic violence complaint on consent on February 21, 2019, agreeing Jerome could not contact Denise and she would remain in the home with the children through the end of March 2019. The parties' divorce was finalized in October 2019.

Jerome denied he ever emotionally or physically abused the children and that they were exposed to domestic violence. He said he had physically disciplined Jay only once, when he was seven years old. He claimed prior to January 2019 he had a wonderful relationship with the children, but that Denise had alienated them against him. He did acknowledge contributing to his strained relationship with the children to the extent he did not enroll them in grief counseling, failed to listen to their concerns, and remarried too quickly. Describing the household dynamics, Jerome testified he did homework with the

A-4045-21

children, took them to their medical appointments, attended parent/teacher conferences, and took the children to their activities, and attended school events. He stated that Denise never engaged in any of those activities. He claimed he prepared the children for school in the morning and walked them to the bus stop. He said although both he and Denise cooked meals for the family, he was the sole financial provider and the only adult who provided the children with emotional support and encouragement.

On March 4, 2019, DCPP filed a complaint for care and supervision of the children, which recited Jerome's history with DCCP and alleged he had engaged in controlling behavior against the children and Denise, yelled at them, physically struck Jay, and perpetuated domestic violence against Denise and Tanisha in the children's presence, which placed them at risk of harm.

The trial court granted DCPP care and supervision of the children and Jerome weekly supervised visits with the children. It also ordered psychological evaluations of Jerome and the children. The children's psychological evaluations concluded all three children demonstrated symptoms of post-traumatic stress disorder ("PTSD") and required trauma-based counseling. Later, the court continued the order of supervised visitation between Jerome and the children but, because of the children's PTSD, allowed visitation to be at the

A-4045-21

children's discretion. The order also directed the children to remain in Denise's custody in the family residence.

On September 5, 2019, DCPP filed an amended complaint for custody of the children. The complaint alleged Denise was "not a sustainable placement for the children" because she was unable to provide them with "housing, transportation, support and food." Based upon DCPP's continued concerns about Jerome, it requested care and custody of the children.

On November 22, 2019, the trial court granted DCPP care and custody of the children, concluding Denise was unable to continue caring for the children "due to her lack of employment, housing and a driver's license." The court placed the children together in a resource home and continued the order of supervised visitation.

On February 3, 2020, the court commenced a fact-finding hearing regarding the allegations of defendant's abuse and neglect of the children. The hearing spanned twelve days. It was suspended between mid-March 2020 and mid-September 2020 due to the COVID-19 pandemic and concluded on September 29, 2020.

While the fact-finding hearing was pending, the court ordered family-reunification therapy between defendant and his children. The court declined

Denise's request for visitation with the children based upon DCPP's concern that it may interfere with family-reunification therapy.

On February 12, 2021, the trial court found Jerome had abused and neglected the children pursuant to N.J.S.A. 9:6-8.21(c) and continued DCPP's care and custody of the children, reunification therapy, and the children's individual trauma counseling and directed Jerome to engage in individual therapy.

Denise subsequently moved to be declared the children's psychological parent. The court held a six-day hearing on Denise's application and adjudicated her as the children's psychological parent in an order dated April 12, 2022. The court then held a best-interest hearing to determine custody of the children, granted Denise sole legal and physical custody of children, and granted Jerome parenting time as agreed to by the children on May 31, 2022. It issued another order terminating DCPP's Title 9 complaint for care and custody of the children on July 18, 2022.

This appeal followed. Jerome argues the trial court erred in relying on testimony that was not credible in finding his abuse and neglect of the children, erred in finding Denise was the children's psychological parent, and erred in

awarding Denise sole legal and physical custody of the children without first terminating his parental rights.

## II.

### A. The Abuse and Neglect Finding

We will uphold a trial judge's fact-findings if they are "supported by adequate, substantial, credible evidence." N.J. Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 373 (2024) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "This deferential standard of review is appropriate because the Family Part judges are presumed to have a 'specialized knowledge and experience in matters involving parental relationships and the best interests of children.'" N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 261 (App. Div. 2018) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012)). However, no deference is given to the court's legal conclusions, which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. B.H., 460 N.J. Super. 212, 218 (App. Div. 2019).

"The purpose of a fact-finding hearing in an abuse or neglect proceeding is not to assign guilt to a defendant, but to determine whether a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.44." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 328 (App. Div. 2011). At fact-finding,

DCPP must prove by a preponderance of the evidence that there has been an act of abuse or neglect committed by the parent. B.P., 257 N.J. at 375 (citing N.J.S.A. 9:6-8.46(b); N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 376 (2021)). "Abuse and neglect cases are generally fact sensitive" and require "careful, individual scrutiny." N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011).

N.J.S.A. 9:6-8.21(c)(4) provides that an "abused or neglected child" is

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.

"Our Legislature has declared that 'children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence.'" N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 491 (App. Div. 2016) (quoting N.J.S.A. 2C:25-18). "[E]vidence of actual impairment to the child will satisfy the statute, but in a case where there is no such proof, the critical focus is on evidence of imminent

danger or substantial risk of harm." N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013). Here, there was sufficient, credible evidence to support the court's conclusion that Jerome's behavior towards the children, Tanisha, and Denise harmed the children's emotional, physical, and psychological well-being, and placed them at imminent risk of future harm. A child's exposure to domestic violence, coupled with credible evidence that they suffered PTSD from this exposure, supports a finding of abuse and neglect. See N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 584-85 (App. Div. 2010).

On this record there is ample legal support for the court's conclusion that Jerome's behavior created an abusive environment for the children, which caused them emotional harm and physical harm to Jay, and placed all three children at imminent risk of future harm. See N.J.S.A. 9:6-8.46(a)(1) ("In any hearing [pursuant to Title Nine], . . . proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child . . . ."); N.J. Div. of Child. Prot. & Permanency v. C.R.A.G., 479 N.J. Super. 504, 537 (App. Div. 2024) ("[I]f [the adopted child] was abused by defendants . . . potential abuse of other children, whether emotional or physical, cannot be discounted." (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. Robert M., 347 N.J. Super. 44, 68 (App. Div. 2002))); Robert M.,

21

347 N.J. Super. at 68 ("[T]he alleged treatment of [one child] could be a dangerous harbinger to one or more of the others.").

In concluding DCPP had proved abuse or neglect by a preponderance of the evidence, the court made extensive and detailed credibility findings, which are supported by the record. The court properly highlighted Jerome's non-credible claims about his "wonderful" past relationship with the children, his purported attempts to facilitate the children's contact with their dying mother, and his attempts to minimize his harmful conduct. Its finding that Jerome was not credible is unassailable. The court's findings were supported by the children's testimony, Denise's testimony, the expert psychologist's evaluation of the children, and the DCPP record, all of which were corroborative of each other. These credibility findings are entitled to our deference. See N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (noting that a trial judge who observes witnesses and listens to their testimony is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand.").

We reject Jerome's argument that the children's expert gave flawed testimony because she had never interviewed Jerome. He does not argue the expert's opinion was inadmissible pursuant to N.J.R.E. 703, but rather, the court erred in the weight it gave this evidence. "[T]he weight to be given to the

evidence of experts is within the competence of the fact-finder." N.J. Div. of Youth & Fam. Servs. v. D.M., 414 N.J. Super. 56, 74 (App. Div. 2010) (quoting LaBracio Fam. P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001)). The trial court identified several reasons for placing greater weight on the children's expert's testimony than the testimony of Jerome's expert, including the timing of the evaluation and that she had conducted a trauma-specific assessment of the children and a more comprehensive review of the family's history. The court did not see her decision not to interview Jerome as a deficit, noting it was not a strategic decision but a professional one, based on the parameters of her evaluation. In contrast, the court criticized Jerome's failure to provide his expert with the full case history, thus depriving the expert of a complete overview of the children's past statements and evaluations. This action underscores Jerome's repeated efforts to control the narrative throughout the litigation.

The court's conclusion that, from at least 2014 to 2019, the children, because of defendant, suffered physical, emotional, and psychological harm due to their exposure to "violence in the home, the physical abuse perpetrated against them and the emotional abuse that occurred systematically in the home" is

23

abundantly supported by substantial credible evidence, and we see no reason to disturb it on appeal.

### B. The Psychological-Parent Determination

As we have stated, a Family Part's findings are entitled to deference on appeal. S.K., 456 N.J. Super. at 261. This same level of deference is applied to findings of fact when determining psychological parenthood. W.M. v. D.G., 467 N.J. Super. 216, 229 (App. Div. 2021).

A fit parent has a "superior right to the custody of his or her child as against third parties." Watkins v. Nelson, 163 N.J. 235, 245 (2000). Yet this right is not absolute. W.M., 467 N.J. Super. at 230. "While there is a presumption supporting a natural parent's 'right to the care, custody, and control of his or her child,' this 'presumption in favor of the parent will be overcome by "a showing of gross misconduct, unfitness, neglect, or 'exceptional circumstances' affecting the welfare of the child[.]"'" Ibid. (quoting K.A.F. v. D.L.M., 437 N.J. Super. 123, 131-32 (App. Div. 2014)). See also N.J.S.A. 9:2-9. Such exceptional circumstances provide "an alternative basis for a third party to seek custody and visitation of another person's child." V.C. v. M.J.B., 163 N.J. 200, 219 (2000). Thus, a third party who has taken a significant part in

raising a child may be adjudicated the child's psychological parent and have standing to pursue custody of that child.  Id. at 219, 221-22.

To adjudicate a third party as the child's psychological parent, the court must make four specific findings:  (1) the legal parent consented to and fostered the relationship between the third party and the child; (2) the third party lived with the child; (3) the third party performed parental functions for the child to a significant degree; and (4) the third party and child formed a parent-child bond. Id. at 223.  Jerome's appeal does not specifically address these factors individually but generally contends that the court erred in its conclusion.

The first prong requires that the biological parent "consent[ed] to and foster[ed] the relationship between the party and the child."  Ibid.  The court must determine whether the biological parent ceded "a measure of parental authority and autonomy" to the third party, by granting him or her parental rights and duties his or her "status would not otherwise warrant."  Id. at 224.  The "critical" assessment is the parent's willingness in establishing the third party's relationship with the child.  Ibid.  Jerome's argument that he never bestowed such rights on Denise, and she never engaged in such a relationship with the children is belied by the record.

Notably, a psychological-parent relationship cannot be based on a paid relationship, such as with a babysitter or nanny. Ibid. Although Denise and the children stated she initially had come to the home as a nanny, Jerome does not raise this as a basis to dispute her claim; he denied she ever acted as the children's nanny. Regardless, Jerome married Denise and left her as the sole daily caregiver of the children while he worked full-time. Notably, at the fact-finding hearing, Jerome testified he had re-married because he wanted to provide a "mother figure" for the children, a claim he reiterated to the psychologist who completed a psychological and bonding evaluation of Jerome. Furthermore, contrary to Jerome's contention, the court properly found he had created the psychological-parenthood relationship when he invited Denise to reside in the home and care for the children.

The parties stipulated to the second prong—that Denise resided with the children.

There is also no error in the court's assessment of the third prong, concluding Denise had assumed the obligations of parenthood. V.C., 163 N.J. at 226. In making this finding, the court focused on Denise's daily caretaking functions—preparing the children for school, preparing meals, teaching them how to cook, cleaning the home, disciplining them, and engaging in activities

26

with the children. The court rejected Jerome's claim he was solely responsible for the children, noting if this were the case, he would not have required a nanny in the past. Relatedly, the court rejected Jerome's attempts to minimize Denise's involvement with the children, noting the bonding evaluations reflected the depths of their relationships.

The trial court correctly found Denise's lack of financial contribution was not determinative. "[T]he assumption of a parental role is much more complex than mere financial support" but "is determined by the nature, quality, and extent of the functions undertaken by the third party" and the children's response "to that nurturance." Ibid. (recognizing that family dynamics vary, such as one parent working as a homemaker who maintains the children and the home). Thus, the emphasis is less on how the parental roles are divided, but whether the third party fulfilled significant parental roles.

The evidence supported the conclusion Denise, and the children also shared a parent-child bond. Our Supreme Court qualifies this fourth factor as the "most important," which requires the existence of a parent-child bond and an assessment "about the actuality and strength" of that bond. Id. at 226-27. Such an assessment generally requires expert testimony. Id. at 227.

Here, the court had the benefit of three expert witnesses, all of whom testified about the close relationship between Denise and the children. Two of the experts emphasized the children's affectionate and engaging interactions with Denise in contrast to their more reserved interactions with Jerome during the bonding evaluation. Both of those experts concluded the children relied on Denise to care for their needs and viewed her as a central part of their lives. In contrast, although Jerome's expert recognized the close and loving relationship between Denise and the children, he declined to call it a parental relationship.

In making its determinations, the trial court made extensive credibility findings. It credited Denise's detailed testimony about her relationship with Jerome and her description of her relationship with the children and described Jerome as attempting to minimize her role. It found Jerome had provided "a stilted and selective perception of his interaction with the children" and failed to take any responsibility for his treatment of the children, even after the finding of abuse and neglect. Moreover, the court deemed his testimony as "wholly inconsistent with the established facts in the case." Given that all three experts had identified a close and loving relationship between Denise and the children, and two experts deemed their relationship as rising to the level of psychological parenthood, there was sufficient support for the court's conclusion the children

28

and Denise shared a parent-child bond. Accordingly, we affirm the trial court's April 12, 2022 order establishing Denise as the children's psychological parent.

C. The Custody Determination

Finally, Jerome contends the court erred in awarding Denise legal and physical custody of the children without first terminating his parental rights. Because a termination of parental rights proceeding is an entirely different legal proceeding with different standards of proof, and because a custody award to one parent instead of another parent, psychological or otherwise, pursuant to N.J.S.A. 9:2-4 is in no way predicated on a termination of parental rights, Jerome's arguments in this regard are meritless. Jerome still maintains parental rights with respect to his unemancipated children, including the right to petition for a change of custody if he can demonstrate changed circumstances.

Moreover, the court did not err in determining custody. It is important to note Jerome did not have physical custody of the children when Tanisha was alive. The court had determined it could not award joint custody primarily due to Jerome's unwillingness to co-parent with Denise. As noted by the court, Jerome was unwilling to sacrifice his desire to unilaterally control the children and put their emotional health first. In addition to his unwavering position, the court commented that an expert witness had recommended against shared

custody due to fear of future abuse and exploitation of Denise by Jerome. Despite Denise's willingness to co-parent, there was no support to show a shared-custody arrangement would be successful.

The court then reviewed the best-interest factors pursuant to N.J.S.A. 9:2-4 to determine an appropriate custody arrangement. It weighed the factors in favor of Denise. The court also placed "significant weight" on the children's preference, noting that Helen and Jay were teenagers, and all three had been steadfast in their preference to reside with Denise. Finally, the court highlighted that Denise had moved to keep the children in the same school, even though it meant switching schools for Laddie, as evidencing Denise's willingness to place the children's needs above that of her own son. It is important to note

Based on this review, the court found it was in the children's best interests to award sole custody to Denise. The court determined that joint legal custody was not feasible, based in part on the expert testimony and Jerome's refusal to co-parent. Thus, the court granted Denise sole legal and physical custody.

In determining an appropriate parenting-time schedule, the court commented on the importance of Jerome having contact with the children. Because the children's relationships with Jerome remained in flux, and each child had a different relationship with him, the court declined to order a strict

visitation schedule. Thus, the court appropriately ordered unsupervised visitation at the children's discretion, to be arranged by the parties. We perceive no error in those determinations and affirm all orders before us on appeal, whether listed in the notice of appeal, or substantively briefed without objection from any party and discussed on the merits in this opinion.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-4045-21